## In re NEW YORK, N. H. & H. R. CO.

### No. 16562.

District Court, D. Connecticut.

Dec. 21, 1943.

H. J. Wells, Gen. Counsel, of New Haven, Conn., for bankruptcy Trustees.

Robert H. Hopkins, Corp. Counsel, of Boston, Mass., for City of Boston.

Major Fred N. Oliver and Willard P. Scott, both of New York City, for Mutual Sav. Bank Group.

John L. Hall and James Garfield, both of Boston, Mass., for Principal Debtor.

Foley & Hoag, and F. A. Boudreau, all of Boston, Mass., for Boston Port Authority.

Colonel Henry W. Anderson, of Richmond, Va., and Curtiss K. Thompson, of New Haven, Conn., for Institutional Group of Boston Terminal Bonds.

Joseph B. Ely and Richard Ely, both of Boston, Mass., for Protective Committee for Old Colony R. Co. Bonds.

Mudge, Stern, Williams & Tucker, and Paul D. Miller, all of New York City, for Group of Banks Holding Collateral Notes of Debtor.

Davis, Polk, Wardwell, Sunderland & Kiendl, Edwin S. S. Sunderland, Judson C. McLester, Jr., and Spencer Byard, all of New York City, for Insurance Group.

Root, Clark, Buckner & Ballantine, and Owen D. Nee, all of New York City, for Bank of New York, Trustee under the New England R. Co. Consolidated Mortgage.

Frank & Gonnet, and Arthur Frank, all of New York City, for Protective Committee for Holders of First Mortgage Bonds of Boston Terminal Co.

Stewart & Shearer, M'Cready Sykes and Francis R. Curry, all of New York City, for United States Trust Co. of New York, Trustee of Harlem River & Port Chester Mortgage.

Henry S. Drinker, Jr., and Edwin A. Lucas, both of Philadelphia, Pa., for Pennsylvania R. R., Common Stockholder.

J. J. Kaplan, of Boston, Mass., and Parker McCollester, of New York City, for Boston & Providence Stockholders Committee.

Robert E. Smith, of New York City, for Protective Committee for Holders of Common and Preferred Stock of New York, N. H. & H. R. R.

John B. Grant, of Watrous, Gumbart & Corbin, of New Haven, Conn., for City Bank Farmers Trust Co., Trustee of First Mortgage of Central New England Ry. Co.

Robert H. Davison, of Boston, Mass., for Webster & Atlas Nat. Bank of Boston, Trustee under Indenture Securing Boston Terminal Co. Bonds.

Damon E. Hall and Rutherford E. Smith, both of Boston, Mass., for Savings Bank Group Committee Boston Terminal Bonds.

Appleton, Rice & Perrin, and Clifton S. Thomson, all of New York City, for Bank of the Manhattan Co.

Beers & Beers, and William L. Beers, all of New Haven, Conn., for Bondholders Committee Boston & New York Air Line Bonds.

Fitzhugh McGrew, of New York City, and Frederick H. Wiggin, of New Haven, Conn., for Bankers Trust Co., Trustee under First and Refunding Mortgage of Principal Debtor.

James L. Homire, of New York City, and Cummings & Lockwood, Counsel of Record, and Frederick Miles, all of Stamford, Conn., for Reconstruction Finance Corporation.

Charles A. Coolidge, of Boston, Mass., for Old Colony R. Co.

Robert T. Bushnell, Atty. Gen., and Arthur E. Whittemore, Sp. Asst. Atty. Gen., for Commonwealth of Massachusetts.

Ferdinand D'Esopo, of Hartford, Conn., for Ferdinand D'Esopo, Jr.

Davies, Auerbach, Cornell & Hardy, H. C. McCollom, and Herbert A. Heerwagen, all of New York City, for Irving Trust Co., Trustee under Collateral Trust Indenture of New York, N. H. & H. R. Co.

Roland H. Parker, of Boston, Mass., for Special Railroad Commission of Massachusetts.

Bentley W. Warren and Donald C. Starr, both of Boston, Mass., for Boston & Providence R. Corporation.

William J. Kane, of Baltimore, Md., for Railroad Credit Corporation.

600

John E. Westerlund, Jr., of New York City, for New Haven Refunding Bond.

Edgar Turlington, of Washington, D. C., for Housatonic Bondholders Protective Committee.

Cornelius Hearn, Jr., for Cornelius Hearn and others.

Daniel Pingree, of Andover, Mass., for Group of 5 Old Colony Stockholders.

Guggenheimer & Untermyer and Hays, St. John, Abramson & Schulman, all of New York City, William H. Foulk, of Wilmington, Del., and John H. Breen, of New York City, for Independent Bondholders Reorganization Committee.

Harold E. Staples, of Providence, R. I., for Rhode Island Hospital Nat. Bank.

Charles S. Clark, of South Duxbury, for Town of Duxbury.

HINCKS, District Judge.

### The New Capital Structure and the Stock Equities.

In this plan, like that previously certified to the court, the Interstate Commerce Commission proposes that the total capitalization of the New Haven shall be fixed at $365,000,000. The plan, however, contemplates that the capital structure may be expended to include the new securities required to fill out the purchase price of the Old Colony and the Boston & Providence. It is not disputed that the claims of creditors, secured and unsecured, amount in the aggregate to upwards of $378,000,000. It follows that if the capitalization proposed be approved, the equity of existing stockholders, preferred ($49,036,700) and common ($157,118,600), is without value. And the Commission has so found.

The cases of Ecker v. Western Pacific R. Corp., 318 U.S. 448, 63 S.Ct. 692, and Institutional Investors v. Chicago, Milwaukee, St. P. & P. R. Co., 318 U.S. 523, 63 S.Ct. 727, hold that under Section 77, Bankr.Act, 11 U.S.C.A. § 205, it is the function of the Commission, not of the court, to fix the total capitalization of the reorganized railroad and to make all determinations of value upon which the new capitalization must depend. In so doing the Commission need state only its ultimate conclusion: "To require it to go further and formalize in findings the numerous

data on which it relied in the exercise of its expert, informed judgment would be to alter the statutory scheme." Milwaukee case, 318 U.S. at page 539, 63 S.Ct. at page 737. The task of the court is not to re-examine the Commission's finding of fact but merely to make sure that it is supported by "material evidence", and is "in accordance with legal standards." Western Pacific case, 318 U.S. at page 473, 63 S.Ct. at page 707. And the requirement of the Act that stockholders shall be excluded only if the Commission's finding that the stock is without value shall be "affirmed." by the judge, means not that "an independent appraisal of the valuation which ordained their elimination" is required of the judge but only that he shall make an independent examination to ascertain whether there is "legal objection to the Commission's use of its own valuation to determine whether particular claimants are entitled to participate" as, for example, when the priority or validity of claims are in controversy. Western Pacific case, 318 U.S. at page 479, 63 S.Ct. at page 710.

I turn, therefore, to consider, first, whether the Commission's finding is in accordance with legal standards.

I suppose the "legal standards" within the purview of independent examination by the judge include the methods of procedure used by the Commission in the development of the plan which it has proposed. But there are here no objections to the proposed capitalization based upon procedural grounds. Nor can I detect at any stage of the proceedings before the Commission any deviation from the procedural requirements of the Act. In successive hearings those now objecting were given full opportunity to present evidence and to be heard. I find no violation of any legal standard of procedure.

Nor does it appear that the Commission's conclusion conflicts with any legal standard in the field of the substantive law. The Supreme Court cases cited make it abundantly plain that for purposes of fixing the capitalization of a reorganized railroad, its earning power is the dominant factor. And the Commission states (pg. 9767)[1] that it has indeed taken into account "past and present earnings and prospects for the future."

---

[1] Unless otherwise specified, all page references in this opinion are to the printed record of the New Haven reorganization proceedings in this court.

To be sure the Commission also states that its conclusion was reached after "taking into account * * * other pertinent factors discussed" in its several successive reports (pg. 9767)[2] and "the improved cash position of the debtor's estate and the reductions in secured obligations" (pg. 10,-131). Doubtless this reference included the physical valuation of the debtor's estate (except for its rights in the New York and Harlem) and of the debtor's capitalizable assets which indeed received discussion in the Commission's reports (pgs. 7930 et seq., 9762). But the reports of the Commission give no more clue as to whether its ultimate finding of value—$365,000,-000 for the entire system minus Old Colony and Boston & Providence—was based solely on the earnings factor or whether the effect of the earnings factor was somewhat modified by the impact of what the Commission called "other pertinent factors."

But this inherent uncertainty as to the precise factors upon which the ultimate finding was based is not fatal. I construe neither the Act nor the Supreme Court cases expounding the Act to mean that factors other than earnings may not lawfully be used to modify the conclusion which would be based solely on a consideration of earnings. The Commission pointed out (pg. 9765) that earnings (a term which I here use as shorthand for income available for fixed charges) for the "prospective year" (meaning average earnings as estimated in 1937 for the next five years (Exhibits 16–17)), that the average earnings in the period 1927–1938, and that the average earnings in the period 1927–1941, all if capitalized at 5% would produce a total less than $365,000,000,—the figure which earnings of $18,250,000 if similarly capitalized would produce. If the Commission concluded that, for the future, average earnings as great as $18,250,000 could not reasonably be expected, but re-

vised upward the result indicated by a lower level of earnings to reflect the greater value of the estate on the basis of a physical valuation, the modification was in a direction favorable to present stockholders and leaves them no ground to complain that they were injured by the application of an illegal standard or method of valuation. If, instead, the Commission found (although it does not say so) that future earnings might reasonably be expected at the rate of $18,250,000 annually, the capitalization proposed was consistent with a valuation based solely on earnings in strict conformity to the policy approved in the Supreme Court cases cited. And the report of the Commission contains no finding that earnings in excess of $18,250,000 might be expected for the indefinite future. Thus whether the capitalization was based upon earnings alone, or whether a result based on earnings was modified by "other pertinent factors", the contention that the stockholders were prejudiced by a failure to comply with legal standards is not substantiated.

On analysis, the objections interposed will be seen to attack not so much the legal standard of the valuation as the exercise of the fact-finding function whereby the tendencies of a multitude of subordinate facts are assembled, correlated, weighed, and eventually merged and translated into the ultimate conclusion as to what total amount of securities consistently with the public interest the reorganized enterprise may properly be left to support. But as observed above, under the Supreme Court decisions this is a function confided exclusively to the Commission. In the field of fact, the only function of the court is to ascertain whether there is "material evidence" to support the Commission's conclusion. I address myself now to that limited task.

The record contains evidence of past earnings in the period 1927–1941, and as

---

[2] This is a reference to the Third Supplemental Report of the Commission, the full relevance of which will be plain only to those who have followed all the successive stages of these proceedings. After the court had disapproved a plan earlier certified by the Commission, in October, 1942 after taking further evidence the Commission published its Third Supplemental Report and Order and thereafter received various petitions for modification thereof. Petitions to reopen also were received, all

of which were denied. The Fourth Supplemental Report and Order, which with the accompanying transcript of the evidence was certified to the court in July, 1943, modified the Third in certain particulars. Thus the Fourth Supplemental Order which states the plan now under consideration rests upon the Third Supplemental Report except to the limited extent that the Third is modified by the Fourth Supplemental Report.

the Commission observed (pg. 9756) the average annual earnings for this period amounted only to $16,229,053, which if capitalized at 5% would produce a total of less than $325,000,000. It was for the Commission in the exercise of its fact-finding function to determine from all the other relevant evidence whether future earnings greater or less than an annual average of $16,000,000 might reasonably be expected. That a much higher level existed from 1927 through 1931 (pg. 7937) certainly tended to show that levels in excess of $16,000,000 might be expected in the future. And the Commission's report showed (pg. 9764) that it had noted opinion testimony, based on future estimated conditions in New England, tending to corroborate that evidence. On the other hand, recent experience in the period from 1932 through 1940 pointed to the hazard of lower levels, at least upon the termination of war-time activities. And traffic trends unfavorable to New Haven traffic were given thoughtful consideration (pg. 7934 et seq.).

In a record replete with evidence tending toward such widely separated conclusions, the only limits on the exercise of the fact-finding power are correspondingly wide. And where, as here, the conclusion reached lies well within those limits, it cannot be said that the conclusion is not supported by material evidence. In the Western Pacific case 318 U.S. at page 477, 63 S.Ct. at page 709, a similar conclusion upon a similar record was upheld in respect to bonds of the Central California Tractor Company. These general observations must control my rulings but their impact upon the specific objections raised by and in behalf of stockholders deserves brief discussion.

■ It is objected that the Commission's failure to appraise the value of the debtor's perpetual rights in the New York & Harlem Railroad which give it access to the Grand Central Terminal in New York City was an error of law effective to vitiate its finding of no value in the stock equities. But as pointed out above, the Commission may have based its proposed capitalization upon earnings only. If so, the value of the debtor's rights to this physical asset is immaterial. And even if the Commission felt that the value of certain physical assets had a stimulating effect on earning capacity and hence was relevant, for present purposes, it might properly have concluded that the value of this particular asset was suitably reflected in a capitalization based upon system earnings derived, in part, from the use of that asset. In any event, the report makes it plain that the possible relevance of the item had consideration (pg. 9766). And as was suggested in an opposing brief, in such a situation it would add nothing of substance for the Commission laboriously to ascertain the physical value asserted and then disregard it—as it properly should if it felt that earnings attributable thereto were sufficiently reflected in the proposed capitalization. Cf. Milwaukee case, 318 U.S. at page 541, 63 S. Ct. at page 738.

■ It is objected that the Commission's action in certain respects is arbitrary and inconsistent with positions taken in its earlier reports in these proceedings. As to this, it is only necessary to observe that it is the present task of the court not to justify a plan previously certified but no longer pending but only to determine whether the valuations inherent in the plan now before the court conform to legal standards and are supported by material evidence. The Commission, like any fact-finding tribunal, has an inherent power to reconsider and adjust its conclusions until they have become incorporated into a final decree.

■ Objection is made that the proposed capitalization fails suitably to reflect the higher earnings of the last two years. Although the last hearing at which evidence was taken by the Commission closed in February, 1942, this plan was not certified by the Commission until July, 1943. And the accompanying report shows that the Commission was advised of the contemporary trend in traffic levels and earnings and indeed took into account a statement of the Trustees which showed that net railway operating revenue for 1942 (on the basis of ten months of actual operations) almost doubled that for 1941. The Commission noted that these increased earnings had exceeded its earlier estimate, but expressed the opinion that "the economic conditions which made them possible" were not "of such a permanent character as to warrant increasing the total capitalization" (pg. 10132). Under the general principles discussed above this was a conclusion for the judgment of the Commission, and is not subject to reexamination by the court.

In this connection, an attempt is made to differentiate the case here from those re-

cently under consideration by the Supreme Court on the ground that the financial condition of the New Haven, its dividend-paying history, its earnings for the period immediately preceding the depression, its capacity in the last two years to pay off defaulted interest and the post-war traffic possibilities of the territory which it serves, all are factors pointing to a continuation of present high earnings to an extent not existing in the particular cases considered by the Supreme Court. But these are differences not of principle but only of degree. Here, just as in the other cases, the factors now stressed lie in the fact-finding field which is reserved to the Commission. The Commission decided that the economic conditions prevailing in a time of war, which produced the unexpected increase in 1942 earnings, were not of sufficient permanence to be treated as factors of valuation for purposes of capitalization.

Thereafter, to be sure, the court admitted further evidence showing the system earnings through June, 1943. But in support of objections to the plan filed with the court, no evidence was received or offered from which it might be found that the economic conditions which produced the increased earnings of 1943 are indeed permanent. It follows that the objecting stockholders have not "carried the burden which they properly have of showing that subsequent events make necessary a rejection of the Commission's plan." Milwaukee case, 318 U.S. at page 544, 63 S.Ct. at page 740.

And as already pointed out, it was for the Commission, not the court, to predict the post-war earnings. The Commission has found that the New Haven, whose rails are so largely paralleled by improved highways, is peculiarly vulnerable to competition with transportation by highway, especially for its passenger traffic (page 7935 et seq.). That the volume of present traffic on the rails has been greatly stimulated by the restricted use of gasoline and the restricted supply of rubber, is obvious. The time when these restrictions will end and the effect of their removal on railroad earnings like the other relevant factors are matters for evaluation by the Commission, not requiring an independent appraisal by the court.

It is suggested in behalf of stockholders that the court before approving a plan which eliminates stockholders should continue the proceedings for the time necessary to determine, presumably by actual experience, the duration of earnings attributable to economic conditions found to be temporary. But such a course subjects creditors to undeserved hardship. In any event, the course proposed is inconsistent with expedition in reorganization which is a chief objective of Section 77. Milwaukee case, 318 U.S. at page 545, 63 S.Ct. 727.

The debtors suggest that I return the plan to the Commission with a recommendation that the present stock equities be found to have value and that warrants be issued to existing stockholders. But the Commission has already found that after the claims of secured creditors have been satisfied by the substitution of securities of equivalent value, the remaining equity in the entire estate will be insufficient to provide full compensation to unsecured creditors. And the explicit finding of no value in the existing stock equities is a necessary corollary. Under the circumstances, it would be officious for me to make a recommendation on a subject matter which Congress has exclusively reserved to the Commission.

Having ascertained, after careful consideration of all pending objections, that the finding of values inherent in the total capitalization proposed and the finding of no value in the stock equities are supported by material evidence and are in accordance with legal standards, under the recent Supreme Court decisions I take it to be my duty, without further inquiry and without need to form any independent conclusion as to the merits of these broad issues, to approve and affirm.

### The Housatonic Issue.

The plan proposes that the holders of these bonds, outstanding in the amount of $2,819,000, shall receive 100% of their claims, principal plus any accrued interest, in new fixed interest bonds. A protective committee of the bondholders objects to this treatment claiming that the bonds should either be paid in cash or should be left undisturbed possibly with their interest rate reduced from 5% to 4%.

These bonds by their terms matured in 1937 but in view of their current earnings interest thereon as it accrued has been paid by the trustees.

The extended maturity date of the new fixed-interest bonds, A. D. 2003, and their

lower interest rate plainly are features less favorable. And, as the Commission noted (pg. 9772), on the basis of the average adjusted segregated earnings (for the period 1933–38) the rate of earnings on the property to be covered by the new mortgage was somewhat less than that of the Housatonics.

On the other hand, the new bonds will constitute a first lien on the greater part of the system including its main lines under a mortgage which will be the backbone of a capital structure designed to withstand the impact of future stresses, whereas the Housatonic mortgage covers but a branch connection and is an appendage on a capital structure, the insufficiency of which has already been demonstrated by hard experience. And, as the Commission has pointed out, the new bonds are buttressed by a sinking fund and a capital fund, and by reason of the vastly greater size of the issue may be expected to enjoy greater marketability.

After weighing these contrasted features, the Commission found that "the new fixed-interest bonds have elements of value which compensate for any comparatively unfavorable features and constitute a fair and equitable equivalent for the Housatonic bonds."

As I construe the recent Supreme Court cases referred to above, this finding is binding on the court. The underlying facts were such as to furnish support either for the conclusion reached or for the conclusion contended for. The conclusion adopted was the product of the experienced judgment of the Commission. Certainly the subject matter was one of valuation: the direct issue was the equivalence between the new securities and the old. And in the Western Pacific case, 318 U.S. 472, 63 S.Ct. 707, the court said:

"The function of valuation thus left to the Commission is the determination of the worth of the property valued, whether stated in dollars, in securities or otherwise. * * * Judicial reexamination was not considered desirable. None of the findings required of the judge under subsection e relate specifically to valuation. Congress apparently intended to leave the determination of valuation 'of any property for any purpose under this section' to the Commission. The language chosen leaves to the Commission, we think, the determination of value without the necessity of

re-examination by the court, when that determination is reached with material evidence to support the conclusion and in accordance with legal standards."

Here, as already observed, there is indeed supporting evidence, and plainly there is nothing to suggest that the Commission's judgment was tainted by the use of improper standards of valuation.

Counsel for the Committee refer me to Mr. Swaine's article in the Harvard Law Review for June, 1943, wherein it is suggested that the language of the Milwaukee opinion contains an implied qualification of the unqualified language of Mr. Justice Reed in the Western Pacific case, quoted above. For in the Milwaukee opinion Mr. Justice Douglas seems to stress the fact that the Commission *and the District Court* (In re Chicago, M. & St. P. R. Co., 36 F. Supp. 193) were satisfied that they had adequate data, etc.; that the Commission *and the Court* did not apply an incorrect rule of law; and that the question was one for the informed discretion of the Commission *and the District Court*. And stress is laid upon the language of Mr. Justice Douglas in the Milwaukee case when he said:

"We would have quite a different problem if the District Court had failed to perform the functions which § 77, sub. e, places upon it. But it cannot be said that there was any such failure here. The District Court satisfied itself that the principles of priority as applied to these facts were respected. See 36 F.Supp. pages 202, 203, 211, 212. Since such a determination rests in the realm of judgment rather than mathematics, there is an area for disagreement. But we are not performing the functions of the District Court under § 77, sub. e. Our role on review is a limited one. It is not enough to reverse the District Court that we might have appraised the facts somewhat differently."

But Mr. Douglas assented in the Western Pacific case and in the Milwaukee case said:

"We need not stop to discuss the respective functions of the Commission and the District Court in respect to plans of reorganization under § 77. That matter has been fully explored in the Western Pacific case [318 U.S. 448, 63 S.Ct. 692]. Against the background of the conclusions there reached, we come to the various objections to the plan."

And if on this point it had been intended in the Milwaukee opinion to qualify the rule enunciated in the Western Pacific case, the dissent of Mr. Justice Roberts and the expressed limitation upon the dissent of Mr. Justice Frankfurter in the Western Pacific case, would have been unnecessary.

I conclude, therefore, that when Mr. Justice Douglas, in the Milwaukee case, spoke broadly of the functions of the Commission *and the District Court,* his expression was elliptical. He was referring, I think, to the fact-finding and valuation functions of the Commission and the function of the court in respect to legal questions, all as delineated in the Western Pacific case. And when the Justice in the passage quoted above was discussing whether the full priority rule of the Boyd case, Northern Pacific R. Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931, had been satisfied by the plan there under consideration, he observed that the District Court had "satisfied itself that *the principles* of priority *as applied to these facts* were respected." He then referred to the opinion of the District Court [36 F.Supp. 211], where the Judge said, speaking of priorities, that the plan "observes the *rules of law* concerning the priority rights" * * * and "would seem to be *in accord with sound principle* and should have judicial approval." The Justice thus emphasized the function of the court in passing upon the principles (the law) applicable to the facts. And when he went on to say "it is not enough to reverse the District Court that we might have appraised the facts somewhat differently", he meant only that when a determination of the facts "rested in the realm of judgment," if the District Court having accepted the determination of fact made by the Commission applied the proper principles of law, it would not be reversed merely because the Supreme Court "might have appraised the facts somewhat differently" *from the Commission.*

And so here, having myself ascertained that the Commission's finding is supported by evidence and appears to be in accord with legal standards, I consider myself duty-bound to accept its finding of equivalence between the Housatonic bonds and the new bonds. Upon that authentic premise I can say that I am satisfied that this feature of the plan is fair and equitable.

### The Secured Sixes and the Bank Group.

The six banks included in this group of objectors are The Chase National, The First National of Boston, The Irving Trust, The National Shawmut, The Second National of Boston and The Union Trust Company of Springfield, each of which is the holder of a note issued by the debtor and now overdue secured by a block of the debtor's First and Refunding bonds, each such block having a face value considerably in excess of the note secured thereby.

The "Secured Sixes" are an issue of 6% Gold Bonds due April 1, 1940, secured by a block of the debtor's First and Refunding bonds held by the Irving Trust Company as Trustee under a Collateral Trust Agreement for the security of the "Secured Sixes" outstanding, the aggregate face value of the pledged First and Refunding bonds substantially exceeding in amount the aggregate face value of the Secured Sixes outstanding.

Since each of the banks in this group and also each holder of the Secured Sixes is a creditor whose claim is now overdue and is secured by a block of First and Refunding bonds having an aggregate face value in excess of the claim secured thereby, their objections to the plan are substantially similar.

Under the provision of the plan as orginally formulated, it was proposed to discharge the claims of the First and Refunding bondholders by the allocation of new securities having an aggregate face value equal to the amount of their respective claims (principal plus interest). Of these new securities, 20% in face value were to be in fixed interest bonds, 40% in income bonds and 40% in preferred stock. This basic treatment of the First and Refunding bondholders has been retained in all subsequent modifications of the plan proposed by the Commission and its fairness and propriety are not now challenged by these objectants or by any other parties. Finding the treatment supported by material evidence and in accord with pertinent legal standards, I can approve this treatment.

But if all the First and Refunding bonds held as collateral by these objectants were to be so treated, each such pledgee because of the amount of its coverage would receive new securities having an aggregate face value substantially exceeding the

amount of his claim. To obviate the undesirable impact of such a result upon the new capital structure, the Commission proposed that these objectants should each be given securities having an aggregate face value no greater than the amount of its claim. And to compensate for the inferior quantitative treatment thus accorded, the Commission sought a qualitative treatment which should be correspondingly superior.

Broadly, the method adopted contemplated an allotment to these objectants of a higher percentage of the higher-grade securities (fixed interest and income bonds) than the 20%–40% allocation of these securities to other First and Refunding bondholders, their allotment to include none of the preferred stock which was allocated to said bondholders. And the problem was to find a treatment for these objectants which would give them new securities having (a) as much value as the securities allotted to other First and Refunding bondholders (subject to a ceiling hereinafter discussed) and (b) an aggregate face value not in excess of their respective claims (principal plus interest).

For this problem the solution proposed by the Commission is as follows: it established the ratio between the face value (principal without any accrued interest) of the collateral held by each objectant and the principal amount of its claim. For the Secured Sixes (collateral $23,000,000, and claim as of December 31, 1941, $15,302,600) this ratio was 1.5 to 1. For the Chase National (collateral $8,200,000 and note of $4,750,000) this ratio was about 1.73. Since 20% in fixed interest bonds were allocated to other Refunding bondholders, to these objectants a *tentative* allotment was made which was 20% times the ratios obtained as just described. (This product I will hereafter refer to as a "factor", in contra-distinction from the ratio just described). Thus for the Secured Sixes the allotment of fixed interest bonds was determined by applying a factor of 30% to the total amount of the collateral (principal plus interest); for the Chase National the controlling factor was 35%. This allotment was then coupled with an allotment of income bonds in an amount equal to the difference, if any, between the principal amount of the claim (principal plus interest) and the total amount of fixed interest bonds allotted as just described. Thus, it will be observed, the ratio used for each objectant was the ratio between principal (face) of collateral without interest and the principal of the debt (without interest). The factor, on the other hand, was applied to the collateral on the basis of principal plus interest.

The allotment just described I have called a tentative allotment because of the ceiling which the Commission imposed upon the amount of fixed interest bonds which each collateral note-holder, including the Secured Sixes, might receive if the method of allocation were given literal application. For the plan provides that no one of these collateral note-holders shall receive fixed interest bonds exceeding in face value the amount of its claim (principal plus interest): if under the tentative allotment a Bank would receive more, its actual allotment is reduced to bonds whose face value equals the amount of its claim and any excess in the tentative allotment is diverted to other secured creditors.

To illustrate: The Commission finds that (as of June 30, 1943, pg. 10149) the factor applicable to the Second National Bank of Boston is 49%. But the collateral of this pledgee as of that date amounted to $1,121,250. If the factor of 49% were applied to that figure this pledgee would be entitled to $549,412.50 in fixed interest bonds. But under the pending plan this pledgee was allotted only $399,834 in fixed interest bonds (and no income bonds or preferred stock) because the principal amount of its claim plus accrued interest as of June 30, 1943 was only $399,834.

Thus it is plain that the attenuated treatment proposed cannot be justified on the theory that the bonds which the pledgee will receive are the equivalent of its collateral. Yet under fundamental principles, a pledgee whose note is overdue is entitled, at least to the extent of his claim, to the equivalent of his collateral. And if his collateral has a money's worth as great as his claim he is entitled to payment in full either in cash or in securities having a money's worth or dollar value at least equal to his claim.

Thus the treatment proposed for the Banks can only be justified on the theory that the new fixed interest bonds will have an actual value in money equal to the amount of the claim. But no finding to that effect, express or implied, can I find anywhere in the successive reports

of the Commission. The witness Davis testified that after a seasoning period of several months in his opinion the fixed interest bonds would be worth 90, the income bonds 40, and the preferred stock 20. This opinion, to be sure, is but the product of the witness' experienced judgment. It is not binding on the Commission whose experienced judgment as to complex questions of fact is entitled to free play under the Act. Conceivably the Commission might accord to the new securities a more generous dollar valuation than Davis. I doubt, however, whether it would go so far as to find that the new fixed interest bonds, in terms of money's worth, will have a value fully equal to their face at the time of their issue or even after an initial seasoning period. In any event, the Commission has not so found as yet, and unless and until it does so find I cannot approve this feature of the plan.

This conclusion does not conflict with my ruling, as applied for example to the Housatonic bonds, that new securities, if the evidence warrants, may be found to have a value equivalent to the old securities surrendered even in the absence of evidence ascribing a dollar value to the new securities. Such a ruling does not necessarily import that the new securities, even the new fixed-interest bonds, will be worth their face in dollar value on their issuance. The equivalence between the old and the new does not import that each in the aggregate is worth its face in dollar value; it means only that if the new issue be worth less than face the old securities also are found to suffer from a corresponding discount. And so to determine the equivalence between a new bond and an old one it is not essential to find and ascribe a dollar value to the new.

■ The method under which the original distribution to these pledgees was made also fails to conform to legal standards in another fundamental particular. For after the allotment of fixed interest bonds was determined by the use of the factor as described above, the method rounds out the treatment of the pledgee by an allotment of income bonds in an amount equal to the difference, if any, between *the amount of the claim* and the amount of the fixed interest bonds already allotted. In thus relating the treatment *not to the value* of the claim as determined by the underlying collateral but, instead,

*to the amount* of the claim, a limitation is introduced which is without relevance on the question of value and is likely to distort results obtained by the application of factors which are truly relevant on that issue. This defect is similar to another to which I now come.

The plan proposed by the Third Supplemental Report of October 6, 1942, treating these objectants by the method described above, called for a total distribution of fixed interest bonds in the amount of $91,-492,387, of income bonds in the amount of $86,112,710 and preferred stock in the amount of $48,443,572. The face value of these securities in the aggregate was equal to the face value of secured claims including accrued interest as well as principal. But after that order was published, the arrearages in defaulted interest were substantially reduced by payments made under order of court out of the current earnings of the system. As a result of these interest payments the aggregate amount of the secured claims has been reduced and if new securities were now to be used on the same basis for the discharge of the old securities there would be needed only $84,-893,097 in fixed interest bonds, $74,431,820 in income bonds, and $66,723,752 in preferred stock. This would produce a capital structure in which the bonded indebtedness was less than that which in the judgment of the Commission the enterprise could reasonably be expected to support. Thus a block of $6,599,290 in fixed interest bonds and $11,680,890 in income bonds became available to sweeten the treatment previously proposed for all mortgage creditors who had not already received an allotment of fixed interest bonds equal to the amount of their claims. The pending plan proposes that this block of bonds be distributed to all secured creditors not already awarded the full value of their claims in the new fixed-interest bonds, *ratably in proportion to the amount of their claims.* New Haven creditors all agree that these excess securities should be distributed to such creditors but objection is made to this basis of the distribution.

■ This objection I must sustain. The treatment frankly bases the distribution on the amount, not the value, of the respective claims, and on this account is not in accord with legal standards. Necessarily, the method used must have an arbi-

trary and discriminatory effect. Surely a creditor whose security is the same in quantity and quality as that of his neighbor is not entitled to a more generous allotment of bonds because his claim is greater. If, as the pending plan assumes, the Air Line issue was fairly treated when allotted under the Third Supplemental Report—before these interest payments had been made—about $1,300,000 in income bonds and the same amount in preferred stock, it will get more than its fair share of this secondary distribution if it now receives, as is proposed, upwards of $170,000 in fixed-interest bonds, $2,800,000 in income bonds and $1,900,000 in preferred stock. Indeed, under this method if the Bank of Manhattan Company had happened to have a single $1,000 First and Refunding bond amongst its collateral, instead of being relegated to the position of an unsecured creditor, it would have received something like $50,000 in fixed interest bonds out of this secondary distribution.

I doubt whether these conclusions require that the plan be returned to the Commission. I incline to believe that the necessary correction can be accomplished within the framework of the plan in complete conformity with all the valid findings of the Commission. To this end this opinion may serve as a suggestion to the New Haven Trustees that they forthwith[3] file a petition for authority to pay the claims of these pledgee banks in cash if they feel that they can demonstrate to the court that such a present disposition of these claims would be in the best interests of the estate. If such a petition were promptly filed and granted, the securities allocated to the banks under the present plan would then become available to augment the available "excess" securities resulting from prior interest payments as described above, for distribution to all secured creditors whose claims otherwise would have been fully paid neither in cash nor in fixed interest bonds as the fair equivalent of their existing securities.

This distribution can be accomplished in conformity with the finding of the Commission that basically the so-called 20–40–40 treatment is a fair treatment for First and Refunding bondholders. The distribution can also be shaped to preserve the same relationships in treatment between the bond issues affected as have already been approved by the Commission without resort to equations of equivalence not supported by the Commission's findings or to methods which I have found not in conformity with legal standards. These relationships can be established by mathematical computations based solely upon findings of the values of the several issues already made by the Commission and which indeed constitute the foundation of the very plan now under consideration.

Whether the Trustees will feel that they can properly support any petition for a present payment in cash of the claim of the Secured Sixes I have considerable doubt. If they feel that they can do so, I will entertain such a petition and rule as the merit of the petition shall require. But even if no order is entered for the present payment of the Secured Sixes a proper disposition of their claim can be found free from the difficulties inherent in the treatment proposed by the plan.

Thus in a decree correcting and approving the plan might be included a provision effective to keep the claim of the Secured Sixes alive for the six months' period succeeding the distribution of the new securities under the plan, coupled with a provision that for their existing collateral there shall be substituted with their trustee the new securities which the Commission has found to be the equivalent of First and Refunding bonds. As a result of these provisions the claim with its attached pledge would be kept alive and at any time before the extended maturity date the reorganized debtor would have an option either to redeem the pledged collateral by payment in full in cash or to suffer a default on the claim and forfeit the collateral.[4] By the

---

[3] But before filing such a petition I think the trustees should negotiate with the banks for settlement on the basis of a reduced interest rate for the period of default. In my earlier rulings, made when the treatment which the banks would eventually receive was problematical, interest was allowed to the full rate sanctioned by the law applicable to the contract. But

for purposes of a cash settlement and to facilitate its accomplishment I think the interest rate should have reconsideration.

[4] Also, it will not be forgotten that at this stage the reorganized debtor under the authority of its new Board of Directors, and without need of any authority from the court, will have power to buy in the Secured Sixes at the then current market.

time the extended maturity date arrives it can safely be assumed that a market will have been developed for the new securities; by then they will have been listed and seasoned. Thus, data will be readily available to the reorganized debtor on the basis of which it can determine whether to redeem or to forfeit. If the decision shall be to redeem, the collateral will be covered into the treasury of the reorganized company where it will be available for future financing. If, however, the decision shall be to default and forfeit, the Secured Sixes will have liberty through their trustee to prove the value of their collateral, by actual liquidation thereof if the trustee shall deem that course advisable, and to claim as unsecured creditors for any deficiency thus established.

To establish the value of the collateral at a time when market value shall have been settled by contemporaneous transactions publicized by the records of established markets will be a task comparatively simple. Nor will it be necessary, I think, to reserve any common stock for the satisfaction of any deficiency claim thus established. For by that time all the factors which will control the determination of the amount of common stock allocable to such a deficiency claim will already have been established. And the value of the common stock also will be apparent from the then current market. As a result, the decree herein may properly provide that the deficiency should be discharged by payment not in common stock but by the cash equivalent.[5] It is plainly apparent, I think, that the amount of cash required for such a purpose will not be large enough to raise any serious problem of financing.

The detail to perfect such a disposition will of course be incorporated into the decree herein which will later be brought on for hearing. Meanwhile a view of the situation in perspective discloses that the treatment proposed in the Fourth Supplemental Order of the Commission harks back to an earlier period of the reorganization when the cash resources of the estate were so limited that it was considered necessary to find some means to discharge the claims of these objectants by payment in new securities. To find a proper treatment for these claims on such a basis which should also be compatible with the limita-

tions considered necessary upon the overall capital structure and upon the various classes of securities included therein gave rise to a problem of wellnigh insuperable difficulty. Even yet no wholly satisfactory solution for this problem has come from any source. Indeed, a genuine solution will apparently require additional findings as to the relative values of the new securities and perhaps of their dollar values. The procedure and treatment which I have outlined makes it unnecessary to make such findings or even to find a solution. Under it such difficulties as are not completely by-passed will largely disappear.

In order that the effect of the corrections necessitated by all my rulings in this opinion may be plainly understood, there will be appended to this opinion a statement, designated Appendix X, which will be comparable to Appendix A to the Fourth Supplemental Report. It is drawn on the hypothesis that each of the Bank Group, expanded to include the State Street Trust Company, will be paid in full in cash: otherwise, as to the Secured Sixes.

### The Under-Secured Banks.

Three banks, the Merchants National of Boston, the Rhode Island Hospital National, and the Bank of the Manhattan Company, are accorded treatment in the pending plan in accordance with my opinion of December 8, 1941 wherein I disposed of their contentions adversely.

All three banks now renew their contentions as previously made and overruled. The Merchants has submitted its contentions on the briefs previously submitted, and the other two after making oral argument have filed supplemental briefs.

After careful study of the transcript of the oral arguments and the supplemental briefs, and after a reexamination of the cases cited therein, I still adhere to the views expressed and the rulings noted in my earlier opinion, the section of which dealing with this subject matter may be deemed a part hereof.

However, the rulings expressed above upon objections not raised to the plan previously certified to the court, require some modification of the treatment of these banks. Broadly viewed, they will be entitled to substantially the same treatment as the Secured Sixes (assuming, of course,

---

[5] The decree will also contain an express reservation of jurisdiction in the court to determine the deficiency, to enforce its payment, and to supervise the distribution.

that the Secured Sixes shall not be paid in full in cash). This treatment also will be shown in Appendix X. And it will be noted that a corresponding correction should also be reflected in the treatment provided for the National Rockland of Boston. The comparatively slight variation of this treatment accorded to the Merchants National of Boston is required by the earlier decision of the Circuit Court of Appeals which was predicated, I think, upon a conclusion that the Merchants' collateral was not a *New Haven security*.

The foregoing, I believe, disposes of all objections filed which relate to the reorganization of the New Haven system exclusive of the Old Colony and the Boston & Providence. I therefore pass to a consideration of the problems involved in the proposed acquisition of these leased lines—problems which heretofore have proved intractable in spite of the mass of litigation and the volume of study and negotiation which has for many years been lavishly devoted to the search for a solution.

### The Old Colony.

### Purchase Price.

The plan provides that the New Haven shall acquire the assets of the Old Colony subject to conditions which will be discussed later at a price as follows:

It will be observed that the price now proposed appears to be precisely that recommended in the Joint Report, the antecedent history of which is as follows. At the hearing on the earlier plan when fundamental differences appeared and were vigorously pressed between numerous New Haven and Old Colony interests and the Commonwealth of Massachusetts, I suggested informally the formation of a "compromise committee" including a representative of New Haven interests, a representative of Old Colony interests, the Assistant Attorney General of Massachusetts who was then representing the Commonwealth in these proceedings, and a member of the trustees' staff, to confer together in an effort to devise provisions for the treatment of Old Colony which might be expected to win the support of all concerned. And when I disapproved the provisions for the treatment of Old Colony contained in the earlier plan, I appended to my opinion the report of this Committee, recommending that it be given appropriate consideration in the formulation of a new plan.

The "compromise" report thus appended to my opinion contained no specific suggestion as to an appropriate purchase price, the members of the Committee indicating a reluctance, if not unwillingness, to negotiate the recommendation of a pur-

| Securities | | | |
|---|---|---|---|
| Fixed interest bonds of reorganized New Haven | | | $3,289,600.00 |
| Income bonds of reorganized New Haven | | | 2,467,200.00 |
| Cash, for unpaid reorganization expenses (as allowed up to January 1, 1941, $140,218.48) upwards of | | | 140,218.48 |
| Cash, Current liabilities, Debtor (None known) | | | |
| Cash, Current liabilities, Trustees: | | | |
| Boston Terminal Bond interest (through 1943, adjusted to accomplish reductions contemplated in the plan) | | | 425,104.00 |
| Cash, Boston Terminal taxes (through 1943 with interest) | | | 1,266,470.00 |
| Cash, Taxes and interest on Old Colony (Exhibit 272, brought down to December 31, 1943) | | | 2,422,222.00 |
| Release of lien claim: | | | |
| Through 1937 | | $ 7,240,772.00 | |
| 1938 | | 3,379,777.00 | |
| 1939 | | 650,066.00 | |
| | | $11,270,615.00 | |
| 1940 | Cr. $ 45,252.00 | | |
| 1941 | " 1,073,330.00 | | |
| 1942 | " 2,361,446.00 | | |
| 1943 (figures not available) | .00 | —3,480,028.00 | 7,790,587.00 |
| Total, in securities (face value), cash and lien | | | $17,801,401.48 |

chase price for inclusion amongst their other proposals for the treatment of the Old Colony, without some official intimation that their general method of approach to the problem was such that the suggestion of a purchase price consistent therewith might prove helpful. And so it was not until after the Examiner of the Interstate Commerce Commission, who was presiding over the hearings on the plan, ordered that the record be held open to permit of the introduction of a negotiated proposal for a purchase price, that negotiations to that end were actually undertaken.

The negotiations were conducted by a representative of the Insurance Group having a large and diversified interest in the numerous bond issues of the New Haven, by a representative of the Mutual Savings Group which had a large interest in the bonds of the Old Colony, and by counsel for the principal debtor. When these negotiations had been completed the purchase price which emerged, together with a comprehensive outline of the factors upon which it was based, was added to the content of the report of the so-called Compromise Committee, thus producing the so-called "Joint Report" which was submitted to the Commission pursuant to the ruling of the Examiner made as aforesaid.

It must be noted that this report did not purport to have any binding effect on any party. On the contrary, the original report of the Compromise Committee expressly stated that it should not be deemed to bind the interests of those whose representatives participated in its preparation. And similarly, it was expressly stated in the Joint Report that in the negotiations "the positions taken by the parties were upon the understanding that all rights were reserved in connection therewith and that such agreement as might be reached would be for the sole purpose of the negotiations". But as the Joint Report states, the price thus negotiated was "formally approved and accepted" by the Insurance Group, the Mutual Savings Group, the Old Colony Plan Committee and the New Haven Plan Committee.

In its report the Commission reviewed the Joint Report at great length, and found that the purchase price proposed in the Joint Report "is fair and equitable, and, in our opinion, conforms to the principles which the court in its opinion· indicated governed." And the order of the Commission now pending before the court contains provision for the purchase of Old Colony assets at apparently the same price and upon substantially the same terms as were recommended in the Joint Report. (The modification of terms other than the purchase price will be discussed later.)

It will thus be observed that although in its report the Commission occasionally refers to the Joint Report as a "compromise agreement", the Commission treated it not at all as an agreement having any binding effect. Its report expressly noted (pg. 9795) that "the Protective Committee for Bonds of the Old Colony and a Group of Old Colony stockholders, oppose the adoption of the Joint Report on the general ground that its suggested purchase price was inadequate." And, as the report of the Commission further shows, other features of the Joint Report were opposed by the Commonwealth of Massachusetts. But notwithstanding these objections the Commission approved the report and adopted the recommendations of the report as its own considered, official conclusions, as evidenced by its Third Supplemental Report and Order of August 6, 1942, which was substantially confirmed in its Fourth Supplemental Report and Order dated July 13, 1943, which is now pending before the court.

The proposed purchase price is now opposed not only by the Protective Committee of Old Colony bondholders but also by the Mutual Savings Bank Group and the Old Colony Plan Committee which had, as shown above, participated in its evolution.

The plan for the reorganization of the Old Colony, which has thus emerged, proposes a purchase price to be paid by the New Haven of three components, cash, reorganization securities and release of its prior lien claim against the Old Colony.

This prior lien claim represented the net loss sustained by the New Haven trustees in their operation of Old Colony lines for the account of the Old Colony. Through 1939 these losses aggregated upwards of $11,000,000. However, in 1940 the tide had turned (for how long, the evidence doesn't show) and at the time when the Joint Report was negotiated, and even by the time the Commission certified the plan to the court in July, 1943, figures were available to show that operations of the Old Colony had resulted in earnings of $45,000 for 1940, and earnings of over a million

dollars in 1941. The earnings for these two years were of course used by the authors of the Joint Report, as indeed they were used in the accounts of the New Haven trustees, to reduce the amount of the New Haven claim.

But apparently because it was recognized that the purchase could not be consummated at least until December 31, 1943, for purposes of the negotiations it was necessary to consider how the claim would be affected by operations in 1942 and 1943. The figures for these years being not then available the authors of the Joint Report, with the aid of advice from experts familiar with these proceedings whose advice heretofore has proved sound, agreed to proceed upon the basis of estimates for the earnings for 1942 in the amount of $225,000 and for 1943 in the amount of $346,000. It should be noted that both the New Haven and the Old Colony representatives participating in the negotiations accepted these estimates. And there is nothing in its reports to suggest that the Commission as well did not accept these estimates. It was not until after the Commission had certified its plan to the court in July, 1943, that the segregated figures for Old Colony operations in 1942, from which alone the results of its operation could be ascertained, became available. These figures for 1942 showed earnings of $1,579,822.25 as against the estimate of $225,000 for that year. The segregation figures for 1943 still are not available, except for the month of January which shows a substantial increase in Old Colony earnings over January, 1942. And it seems not to be disputed that when available the figures for 1943 will be at least as favorable to Old Colony as those for 1942.

And so Old Colony representatives now contend that the purchase price should be increased to reflect the result of operations through 1943. They point out that the prior lien as a component of the purchase price was based upon an estimate adopted by all parties to the negotiations which has now by actual experience proved grossly out of line and insist that an error of such dimensions ought in justice and equity to be corrected now while there is still opportunity for correction.

They point out that they are not seeking to capitalize war earnings; instead they are merely claiming, wholly in accord with the basic theory on which the negotiations

were conducted, that the New Haven which is seeking to use its prior lien claim, as a component of the purchase price to pay for the Old Colony at some time subsequent to December 31, 1943, should be limited to a claim against which all earnings of the property, at least prior to December 31, 1943, have been credited,—just as such earnings are currently being credited on the books of the Trustees. Otherwise, they say, Old Colony will be holden twice to pay the same claim.

This line of argument I think sound. It is, I think, impervious to the counterattack which I will now discuss.

In opposing the correction now sought New Haven interests insist that a consummation of the plan as proposed will not result in a double payment of any portion of the New Haven lien claim. For, they say, notwithstanding the belated increase in Old Colony earnings "the price which it (New Haven) is to pay and the property received are not changed." This, I think, is not true. The principal medium which the New Haven is using to accomplish the payment is its lien claim. If its claim, as a result of Old Colony earnings, is materially reduced, the New Haven will be paying less than the Commission proposed; unless appropriate adjustment is made for the reduction.

It is urged that the price "expressed in securities of the reorganized New Haven was the result of a series of adjustments." But the issue now raised has immediate incidence not upon that portion of the price which was expressed in securities but upon the portion which was expressed in terms of the lien claim. And the basic theory of the method of valuation used is such that so much of the consideration as shall not consist of cash and release of lien claim shall consist of new securities. Provision was not made for adjustments on account of subsequent fluctuations in the amount of the lien claim resulting from earnings only because, apparently, it was thought that the generally accepted estimate of $571,000 for such earnings made provision for adjustment unnecessary.

It is said that the authors of the Joint Report "agreed upon the price, knowing of possible fluctuations in earnings." But all the authors could do was to agree to recommend. What they intended is not now decisive. On the issue of a valuation,

such as is now involved, the opinion of the judge is not controlling. The vital question is one relating to the conclusions of the Commission. Is the price which *it* proposed now consistent with its stated reasons? I think not.

For the Commission's report makes it plain (pgs. 9790, 9791, 9794) that the price *it* proposed was on the basis *of December 31, 1943*. To be sure, it also accepted the estimate that the 1942 and 1943 earnings would amount to only $571,000. But in so doing it recognized that, under the particular method of valuation, which it adopted for the solution of this particular and peculiar problem, *in principle* all earnings up to December 31, 1943, should be included. At the time, those earnings could only be estimated and the Commission believed, as well it might under the evidence, that the estimate—endorsed as it was by opposing parties and experts— would accomplish substantial justice. But now that subsequent experience has demonstrated that the estimate has gone awry, I have confidence that the Commission while there is yet time would wish to have the plan corrected to conform with established results. I shall proceed on that basis.

I cannot agree, however, with Old Colony contentions that the excess of earnings over estimate should be paid to them in cash. The cash representing the earnings was collected by the New Haven trustees charged with the duty of operating Old Colony lines for the account of Old Colony, and upon its receipt Old Colony was entitled to an appropriate credit, not to cash. The resulting reduction in the prior lien should be reflected not in the cash component of the consideration but rather in the component consisting of new securities. To translate the reduction into cash, would in effect accord to this secured obligation of the Old Colony, notwithstanding its recurrent deficits in recent years, a greater worth and dignity than the Commission has accorded to any of the creditors of the New Haven secured by mortgage on property far more productive. Such treatment would be inconsistent with the fundamental scheme of the plan.

But what basis have we upon which to translate the reduction in the lien claim into an appropriate treatment in securities? If the plan had been consummated on December 31, 1942, the following treatment might have been prescribed. The earnings for 1942 were $1,579,822.25 (pg. 10520). But the price fixed by the Commission was on the assumption that the 1942 earnings would be only $225,000. The problem is to translate the difference between these two figures, $1,354,822.25, into new securities which may fairly be substituted in the purchase price for the equivalent amount of prior lien.

Under the basic mechanics of the plan the new securities must have a face value of $1,354,822.25. Not a single secured creditor unhappily involved in these proceedings will receive under the plan new securities having a face value greater than the amount of his claim: and none, I think, will receive less (in face value).

But by what class or classes of securities shall this requirement be satisfied? As to this it will be noted that in the plan the Commission proposed that so much of the purchase price as exceeded the cash and prior lien should be payable in $3,289,600 of fixed interest bonds, and $2,467,200 of income bonds. Thus our problem for 1942 might be solved by allocating to Old Colony an additional block of new securities having an aggregate face value of $1,354,822.-25 divided between fixed-interest bonds and income bonds in the ratio of 3,289,600 to 2,467,200. This, if the mathematics is correct, would amount to $774,184 in fixed-interest bonds and $580,638 in income bonds.

The same basic method will be equally applicable for the year 1943. But due to the unfortunate yet unavoidable fact that there is a time lag of nine or ten months between the end of an accounting period and the availability of the segregation figures, the 1943 figures are not yet available. Hence a modification in the mechanics of the plan will be required.

To meet this feature of the situation let the decree provide for the reservation of $1,500,000 in the new bonds, divided betwixt fixed interest bonds and income bonds in the proportion of 3,289,600 to 2,467,200, for delivery to Old Colony bondholders upon consummation of the plan (by which time the segregation figures will be available) up to the amount, but not exceeding $1,500,000, called for by the actual segregation figures, the balance (if any) either to be cancelled or to be returned to the reorganized New Haven where they will be available for future financing. I suggest that the amount of bonds thus reserved be $1,500,000 because after deducting

$346,000 of earnings already reflected in the plan, that figure is about 20% in excess of Old Colony earnings for 1942 and some Old Colony parties, with some encouragement from the segregation figures for January, 1943, profess to believe that notwithstanding the impact of retroactive wage awards and mounting taxes, the earnings of 1943 will exceed those of 1942. The mechanics involved will make a present evaluation of that contention unnecessary. And the procedure just prescribed will involve no substantial expense since no interest will accrue against the New Haven on any bonds thus reserved which shall never be delivered.

Thus, in effect, a reservoir of securities will be available for such adjustment between the components of the purchase price as actual experience shall require.

Under the scheme of the plan as proposed by the Commission, as we have seen, the capitalization of the New Haven minus Old Colony and Boston & Providence was limited to $365,000,000: the plan contemplated that for the New Haven plus the Old Colony the capitalization might be increased by the amount of the new securities included in the consideration for the purchase price. Consistently with this aspect of the plan, it might plausibly be argued that the overall capitalization should be expanded by the amount of the additional securities now provided to compensate for the shrunken lien claim. However, such treatment would result in some small increase in the fixed charges and produce an overall capitalization (if the Boston & Providence be also acquired on the terms proposed in the plan) somewhat in excess of the figure ($376,731,053) which the Commission has expressly sanctioned (Note 24, Appendix A to the Fourth Supplemental Order). Therefore, and in order that the decree shall conform literally to every lawful limitation imposed by the Commission, the Statement hereto appended as Appendix X, which I propose to use as the basis for the decree herein, shows a distribution under which the additional bonds (which, be it remembered, do not constitute additional consideration) reserved for Old Colony shall involve no increase whatever either of capitalization or of fixed interest over that limited by the Commission.

### The Conditions of Acquisition.

Heretofore, the unsurmountable obstacle to a merger between the New Haven and Old Colony has been the recurrence of the large deficits resulting from the operation of Old Colony lines. The two factors chiefly contributing to this situation have been the obligations of the Old Colony to the Boston Terminal Company and the losses resulting from passenger operations. Both of these factors were dealt with in the report of the Joint Committee and the remedies therein proposed, with only minor modifications, were approved and adopted by the Commission. The treatment proposed in the plan to limit the Old Colony and New Haven obligations to the Terminal Company I will discuss at a later stage in this opinion. It is sufficient here to note that the proposed treatment is effective to reduce the annual fixed charges of Old Colony on account of this item by about $91,434 (on the present use basis).

The losses from passenger service are attributable principally to the operation of the so-called Boston Group of Old Colony lines. The entire earnings of the Old Colony from its freight business are estimated in a normal year to amount only to about $525,000. To prevent the loss from passenger operations in normal times from completely offsetting this income, the plan proposes that the reorganized New Haven and the Old Colony shall be relieved of all charter obligations to operate passenger service on all Old Colony lines but shall undertake a contractual obligation to operate for its own account passenger service on Old Colony lines if and so long as the losses therefrom (a) do not exceed $850,000 for any 12 consecutive months all of which are within the period of two years following the consummation of the plan, and (b) do not exceed $500,000 for any 24 consecutive months beginning not earlier than two years after consummation.[6] Thus under the plan the reorganized company will still be obligated to maintain passenger service as long as these conditions shall obtain. And opportunity is afforded the public authorities to make their own arrangements to take over passenger service on the Boston Group which produces most of the passenger deficit, or to sanction the elimination of deficit-producing passenger service on any Old Colony

---

[6] The limiting figure recommended by the Joint Report was $250,000 for 12 months, as against the figure of $500,000 for 24 months adopted by the Commission.

rails, and thereby to insure a continued obligation on the reorganized New Haven to maintain passenger service except as thus relieved by the voluntary cooperation of the Commonwealth. If through such cooperation or otherwise, the passenger losses shall be kept within these critical figures, the New Haven, by virtue of its proposed acquisition of the Old Colony, will be under a continuing obligation to subsidize passenger service on Old Colony lines to the extent of $250,000 annually. This continued drain upon New Haven resources under the theory of the plan will be more than offset by Old Colony freight earnings,—which the Commission has found may be expected to amount to $525,000 in a normal year.

Thus the arrangement proposed is in effect a compromise between private and public interests. Without some assurance that expected passenger losses might not, as in the past, completely absorb the freight earnings, neither the New Haven nor any other institution of private capital could afford to risk the hazard involved in an acquisition of the Old Colony and all value (except the salvage value) would be squeezed out of the capital invested in the Old Colony. The plan by conditioning the mandatory obligation for passenger operation upon a reduction of the resulting loss to $250,000 annually, or more accurately to $500,000 biennially, leaves some margin of profit to justify the price proposed: it saves Old Colony capital from extinction. But the hazard that all passenger losses up to $250,000 must be absorbed, necessarily reduces the value of Old Colony capital,— a reduction amounting to something like $6,000,000 on the basis of a 4% capitalization.

Because the passenger losses of the past have stemmed mostly from the Boston Group of Old Colony lines and because of the possibility that public authorities might arrange eventually to institute some form of publicly-operated passenger service over the so-called Braintree segment of this group—an arrangement which would at least go far toward keeping the losses from the remaining privately-operated passenger service within the critical figures specified above—the plan provides that title to the Boston Group, even after the acquisition of the remainder of Old Colony assets shall be consummated, shall remain in Old Colony. However, the New Haven is provided with an option to take title at any future time without the payment of additional consideration and is subject to an obligation to take title if within two years after consummation the Massachusetts legislature shall (a) by charter amendment of the Old Colony exempt it from passenger service or (b) "by legislation provide equivalent protection (such as that resulting from the formation of a transportation district to take over service on the Boston group)".

And the plan further provides that upon a termination of passenger operation on the Old Colony by the New Haven because of passenger losses in excess of the critical figures mentioned above, the Commonwealth of Massachusetts for the period of ten years shall have the option of purchasing that portion of the Boston Group which extends from Boston to Braintree at the salvage value. The definition of this option I shall presently discuss.

Certain features of the Old Colony plan are opposed by the public authorities of the Commonwealth of Massachusetts represented by its Attorney General and the Special Railroad Commission created by its legislature.

It is contended that to the extent that the plan purports to amend the Old Colony charter as established by the Massachusetts legislature and by this device seeks to exonerate the New Haven as a purchaser of Old Colony assets from the charter obligation of the Old Colony to operate passenger service on what are now Old Colony lines, it is without warrant in law. This objection I think is unfounded. Certainly it is not supported by any citations. It is contrary to the implications of the Milwaukee case and Palmer v. Massachusetts, 308 U.S. 79, 60 S.Ct. 34, 84 L.Ed. 93.

In the latter case, this court, in an effort to put Old Colony operations into shape for reorganization, had ordered the discontinuance of 88 passenger stations which contributed to the operating deficits. The Commonwealth, on appeal, challenged the jurisdiction of the court thus to order a curtailment in local service. The Supreme Court said (308 U.S. 88, 60 S.Ct. 38, 84 L.Ed. 93):

"It would violate the traditional respect of Congress for local interests and for the administrative process to imply power in a single judge to disregard state law over local activities of a carrier the governance

of which Congress has withheld even from the Interstate Commerce Commission, except as part of a complete plan of reorganization for an insolvent road."

The final clause of this quotation plainly implies the existence of lawful authority in the Commission to do just what it has done here.

 Moreover, the limitations upon the future obligation of the New Haven to maintain passenger service are in the field of the public interest. This is so not only because they touch service to the public but also because they affect the capacity of the property to meet its fixed charges and hence the formulation of a capital structure appropriate for the enterprise. Under the recent Supreme Court decisions, it is the exclusive function of the Commission to determine whether in the plan the needs of the commuting public in the Boston area for passenger service at less than cost have been brought into proper balance with needs of a broader public for a service which in the long run can only be furnished by an enterprise capable of supporting its fixed charges under a revitalized capital structure.

Thus the contention of the public authorities. that the plan is contrary to the public interest is one that I am without power to entertain. So also as to the contention that the objective of the plan to provide a limitation on passenger losses could better have been attained by some other arrangement than that proposed. I note only that the Commission seemed to feel that this feature of the plan was as considerate of local needs as any plan which with due regard for general public needs and private rights it could conscientiously formulate (pgs. 9787–8); that it was "fair and equitable", and that it did "not believe that, under the existing circumstances, the public interest would be impaired" thereby.

 The insistence of the public authorities that the New Haven by virtue of its long-continued operation of Old Colony lines under a lease legally assumed in perpetuity all the public obligations contained in the Old Colony charter granted by the Commonwealth is without basis in law. It is inconsistent with the provisions of Section 77, sub. c (6). In Palmer v. Webster & Atlas Nat. Bank, 312 U.S. 156, 61 S.Ct. 542, 85 L.Ed. 642, the court recognized that after the rejection of the Old Colony lease the operation of its property by the New Haven trustees was an "involuntary operation" under the mandate of Section 77, sub. c (6), as distinguished from the performance of a contractual or charter obligation, inherited or otherwise.

Although I can sustain none of the objections of the Massachusetts authorities to the substance of the plan, two proposed modifications thereof in favor of the Commonwealth were unopposed by any party to these proceedings and may be approved.

As stated above, the plan as proposed provides that the critical period for the measurement of passenger losses, upon which the rights to discontinue passenger service will depend, shall begin to run upon the consummation of the plan. As an additional safeguard against any dislocation of travelling habits at this time of unusual stresses and restrictions upon all the agencies of transportation, for the indefinite date of "consummation" the date of January 1, 1946, may be substituted in the decree as the date upon which the critical period shall begin to run.

And the plan as proposed contemplates (pg. 10211) that the proposed contractual obligation of the New Haven to maintain passenger service on all Old Colony lines and freight service on the Boston Group shall be attested by a stipulation between the reorganized New Haven and "the legal representatives of the Commonwealth". Objection was made that no representatives of the Commonwealth have or will have authority to enter into such a stipulation. The decree may therefore provide that the contractual obligation as proposed may stem from the plan as thus modified and approved in the decree.

One feature of the Old Colony plan needs clarification. As noted above, Paragraph N(3) (a) of the Commission's Fourth Supplemental Order gives the Commonwealth a ten-year "option of purchasing that portion of the Boston Group lines extending from Boston to Braintree at the salvage value thereof, etc." At the hearing before the court a controversy arose, the Commonwealth contending that under this provision its option covered all the included facilities whether needed for passenger operation or for freight operation and New Haven interests contending that the option should be construed to include only such facilities as might be needed for passenger operation.

It thus appears that there is indeed need to construe this provision of the plan and agreeably to Paragraph R of the Fourth Supplemental Order I construe the option, as provided in Paragraph N(3) (a), as limited to such facilities as shall reasonably be required by the Commonwealth for its passenger operation, subject, however, to a right in the New Haven to make joint use of such facilities as are not reasonably required for the exclusive use of the Commonwealth.

The decree herein will so provide and will further reserve jurisdiction to the court to determine at the appropriate time, if future controversy should arise, just what facilities are in fact reasonably needed for passenger operation and the salvage value thereof as it shall be established by the method approved by the Commission. The reservation of jurisdiction is necessary since obviously the precise needs of the Commonwealth in the premises cannot be known until its plans shall take on some definite shape.

This construction, I think, is plainly required by a consideration of the Commission's report. The option must, of course, be defined not by what the Commonwealth hoped to get but rather by what the Commission intended to give. The Commission, in stating its understanding of the objections and counter-proposals of the Commonwealth to the Third Supplemental Report, referred to representations by the Commonwealth that in the event of a discontinuance of passenger service by the New Haven it would itself (i. e., the Commonwealth) be obliged "to furnish such transportation to its citizens", and that thereupon it "would be at a disadvantage in negotiating with the New Haven then in control of the properties, for the use of its facilities" (pg. 10152). And the Fourth Supplemental Report plainly shows that the option was finally included to relieve the Commonwealth from disadvantage in negotiating for the use of needed passenger facilities. Nowhere does the report suggest that the Commission intended that the reorganized New Haven should be excluded from facilities needed by it for the maintenance of freight service and not needed for the exclusive use of the Commonwealth in its operation of passenger service.

This construction of the option makes it unnecessary to determine whether an insolvent railroad in reorganization under Section 77 may be compelled as a condition of its reorganization to contract away facilities needed for the maintenance of its freight service even to a sovereign State having no cognizable claim in damages and no claim of title.

The objections of the Town of Duxbury relate to subject matter in the domain of the public interest which lies exclusively in the jurisdiction of the Commission. I am, therefore, without power to withhold approval upon the grounds of these objections.

The so-called Crocker or Pingree Committee of Old Colony stockholders asks that the plan be so amended that Old Colony stockholders be afforded an opportunity to purchase the unsecured claim of Old Colony against the New Haven. To accomplish this the Committee recognizes that it would be necessary first to obtain a specific valuation of this asset by the Commission and suggests that through a syndicate funds could be found to purchase at a price thus appraised under an arrangement whereby Old Colony stockholders would have an opportunity to participate.

But under the Milwaukee case, the court is without authority itself to make a proposal so at variance with the plan proposed by the Commission or even to disapprove a plan proposed by the Commission on the ground that a different or a supposedly better plan might have been evolved. The proposal, whether viewed as a motion or an objection, must be denied and overruled.

The Protective Committee of Old Colony bondholders in addition to its objections to the proposed purchase price has pressed numerous other objections to the plan. I find none of these objections, however, to be of such tenor or substance as to preclude my approval of the plan corrected as provided in this opinion.

I conclude therefore that the purchase price proposed for the acquisition of Old Colony, corrected as described above to give effect to what I believe to be the essential finding of the Commission as to the value of its assets is a feature of the plan supported by material evidence and in accordance with legal standards. Likewise, as to the finding of the Commission that the capital stock of Old Colony is

without value. I conclude also that the provision which the Commission has made for the limitation of future passenger losses on Old Colony rails and all other provisions of the plan relating to the public interest are supported by material evidence, in conformity with legal standards, and within the lawful power of the Commission to propose. On the basis of such findings by the Commission, the finding that the stock is without value may be affirmed and the plan as corrected herein in all its features relating to Old Colony I approve as fair and equitable provided its cognate provisions for the reduction of Old Colony's fixed charges to the Boston Terminal Company may also be approved. To the controversy on that front I will shortly come.

### The Boston & Providence.

The plan proposes that the New Haven shall acquire all the assets of the Boston & Providence Railroad Corporation for a purchase price as follows:

no information, however, of any claims falling within this category.

It thus appears that (without taking into account the operating results of 1943) the price proposed is almost $3,000,000 greater than that proposed in the earlier plan.

In effect, this feature of the New Haven plan is an offer to purchase on the terms stated; if the plan is approved the offer becomes a firm offer which can be accepted only if the correlative provisions in the plan for the reorganization of the Boston & Providence shall be approved as a part of that plan by the Massachusetts court.

■ The Boston & Providence objects that the purchase price proposed is inadequate and hence unfair to Boston & Providence interests. But this is not an objection for this court to consider. The question for this court is whether from the standpoint of New Haven interests the purchase price is excessive.

| | |
|---|---:|
| Fixed interest bonds of reorganized New Haven | $ 3,039,213. |
| Income bonds | 1,467,520. |
| Preferred stock | 1,467,520. |
| Cash, Reorganization expenses (to January 1, 1941), upwards of | 152,225. |
| Cash, Current liabilities, Debtor. (None known) | |
| Cash, Current liabilities, Trustees: | |
| Bond interest due Boston Terminal Company to December 31, 1943 (adjusted to reflect reductions accomplished by the plan) | 425,104. |
| Boston Terminal taxes and interest, through 1943 | 1,266,470. |
| Cash, Taxes and interest on Boston & Providence through December 31, 1943 (as shown on a revision of Exhibit 272 brought down to date) | 876,996. |

Release of lien claim through December 31, 1943.

| | | |
|---|---:|---:|
| Through 1939, as liquidated by stipulation | $7,000,000. | |
| 1940 (exclusive of Boston Terminal charges) | 1,551,127. | |
| 1941 (exclusive of Boston Terminal charges) | 999,478. | |
| | $9,550,605. | |
| 1942 (exclusive of Boston Terminal charges) Cr. | —809,601. | |
| | $8,741,004. | |
| 1943 (Figures not yet available). | 00. | 8,741,004. |

| | |
|---|---:|
| Total, in securities (face value), cash and lien | $17,436,052. |

In addition the plan provides that the reorganized New Haven shall assume all claims allowed by the Massachusetts court against the Boston & Providence except Boston & Providence debentures and any claims not ranking senior thereto. I have

But even so, the question is essentially one of value. The record shows that the Commission took into account the earnings of the property on the basis of a segregation formula which the Commission itself had approved. It considered

the traffic "contributed" by the Boston & Providence to, the New Haven. It considered also the physical valuation of the property on the basis of original cost, cost of reproduction new, and cost of reproduction less depreciation, the latter valuation being found to be $15,747,663 as of December 31, 1936, plus $7,473,365, as representing the value of the land and rights. The Commission also considered the severance value of the Boston & Providence to the New Haven, and the additional capital and operating expense to which the New Haven might be put if through inability to use Boston & Providence rails it should be required to develop an alternate route from Boston to Providence to handle mainline through traffic. The Commission recognized that many of the elements or factors involved were of such a nature that it was not possible to ascribe to them precise money values. It recognized further that the value of Boston & Providence properties to the principal debtor "cannot be determined by mathematical calculations, but that it is essentially a matter of judgment based upon a consideration of the intangible elements and a general knowledge of system requirements" (pg. 9807). And thus the purchase price proposed was fixed.

 Under the Supreme Court cases cited above the valuation thus made, since supported by evidence, is not open to re-examination by the court if not shown that the finding of the Commission was influenced by other than legal standards. And I find nothing in the Commission's report to indicate that its judgment was influenced by other than legal standards.

 Similarly, it is objected that the best interests of the New Haven require the sanction of a better offer lest the offer be refused on behalf of Boston & Providence interests by the Massachusetts court. But this objection raises a matter of business judgment. A somewhat similar question was involved in the Milwaukee case where the Commission had apparently felt that terms less favorable than those which it had proposed for a new lease might jeopardize consent to a new lease. The court said (318 U.S. 557, 63 S.Ct. 745), "we cannot substitute our opinion for the business judgment of the Commission." So, here, this court cannot substitute its opinion for the business judgment of the Commission if the Commission felt the terms proposed were adequate to result in the consummation of a sale.

Moreover, an objection such as that just noted obviously has little application where, as here, the offeree (i. e., the Boston & Providence acting through the Massachusetts court) must, if I am right in my construction of the cases, accept the finding of the Commission as to the value of its property as contained in its proposed plan for the reorganization of the Boston & Providence. If the price fairly reflects the inherent value, it is fair to the offeree as well as the offeror. In the Milwaukee case the offeree was not under reorganization and the Supreme Court seemed to recognize (318 U.S. 550, 63 S. Ct. 727) the practical fact that the capacity of proposed terms to induce consent is important only where the offeree is one whose free course of action is untrammelled by the restrictions incidental to reorganization proceedings.

 It is also objected that the plan is defective in that it fails to compensate the Boston & Providence for the use of its property by the New Haven trustees from the date of the rejection of its lease to the prospective date of payment of the purchase price. But when the New Haven trustees rejected the lease, under the mandate of Section 77 they were under duty thereafter and during the pendency of these proceedings to operate the property for the account of the lessor. This they did with the financial results set forth above. Under the rule of Palmer v. Palmer, 2 Cir., 104 F.2d 161, the New Haven trustees instead of being liable to "compensate" the Boston & Providence for the use of its property, though accountable for the profits of operation, if any, have a prior claim against the property for operating deficits actually sustained.

Other objections registered against the New Haven plan are based on provisions of the plan for the reorganization of the Boston & Providence for the distribution amongst Boston & Providence creditors and stockholders of the consideration for the proposed purchase. This court is without jurisdiction to pass on such objections: they involve subject matter for rulings by the Massachusetts court.

 It is also objected that the New Haven plan is defective in that the proposed purchase does not include any share of the so-called "excess" bonds which became available for distribution when the claims of secured creditors of the New

Haven were substantially reduced by the payment of interest accrued thereon, as described in that section of this opinion dealing with the claims of the collateral note-holders. I have already ruled that the method whereby the Commission proposed to distribute these excess securities was not in accordance with legal standards. But the ruling will not help the Boston & Providence for under my ruling also the Boston & Providence is not entitled to participate in that distribution. The securities involved were part of those which the Commission had theretofore proposed to distribute to secured creditors of the New Haven. To the extent that the claims of these creditors were reduced by the interest payments, it became necessary to reduce the amount of the securities which originally it had been proposed to allocate to them and the securities thus released became available for distribution to others. But even so, these "excess" securities were all needed to compensate fully other secured creditors of the New Haven, of which the Boston & Providence is not one. Under such circumstances, to distribute them to a common creditor of the New Haven, such as the Boston & Providence, would offend the full priorities rule as enunciated in the Milwaukee case.

The objection that the plan is defective in that it fails to credit the Boston & Providence with the reduction in its fixed charges accomplished by the proposed modification of its obligations to the Boston Terminal Company, must also be overruled. It is true that the purchase price proposed in the earlier plan was predicated upon a disposition which left these fixed charges unabated. And so there is a surface plausibility in the argument that the purchase price now proposed, which looks much the same as that previously proposed, should be increased to reflect this reduction in the fixed charges of the property.

But in fact, the price now proposed, due to extended accruals and accumulated deficits, is substantially greater than that heretofore proposed. And also the Commission has reported (pg. 9807) that "this (very) factor *is* reflected in the amount of reorganization securities to be included as a part of the purchase price."

The other objections interposed are all based upon the contention in variant forms that the proposed purchase price is inadequate from the standpoint of the Boston & Providence. I find no question of law involved in such objections: at most, they constitute unsubstantiated challenge to the accuracy with which the Commission has discharged its function in the field of valuation.

And so, finding the valuation as made by the Commission supported by evidence and not in conflict with legal standards of valuation or with any legal principles, I accept the finding as made by the Commission without further reexamination. Upon that premise and upon condition that the fixed charges of the Boston & Providence also to the Boston Terminal Company shall be reduced as proposed, I am prepared to approve as fair and equitable all provisions of the plan for the purchase of Boston & Providence properties.

Before adopting the ruling just stated I gave much thought to the possible applicability to the price proposed for the Boston & Providence of the factors which impel me to correct the price proposed for the Old Colony. I concluded, however, that the record leaves no room for such a correction of the price for the Boston & Providence. There is nothing in the report of the Commission to suggest that the price was based on an estimate of earnings which time has disproved. In its Third Supplemental Report, after noting the recorded deficits for 1938, 1939 and 1940 the Commission spoke of the deficit for 1941 as being estimated at $1,625,843. (pg. 9807). The figures since assembled demonstrate this estimate to have been substantially accurate. And for aught that appears the earnings for 1942 and 1943, in so far as considered pertinent, may have been correctly reflected in the price proposed.

Moreover, the report shows that for the Boston & Providence, the Commission used a different method of valuation. For the Boston & Providence there was no showing of a probable excess of freight earnings over passenger deficits in normal times, as in the case of the Old Colony. To find a value for the Boston & Providence such as that expressed in the proposed purchase price, it was necessary for the Commission to give it the benefit of "many elements or factors" to which it "was not possible to ascribe * * * precise money values." And so, for the Boston & Providence the result was "essentially a matter of judgment based upon

a consideration of the many intangible elements and a general knowledge of system requirements" (pg. 9807). If I should attempt to adjust a price so reached for the belated reduction in the prior lien—a reduction much smaller (at least on the basis of figures for 1942) than in the case of Old Colony—there is danger that in so doing I might either give Boston & Providence a credit already accorded to it by the Commission or might distort the result by superimposing upon the price a credit not appropriate to the method of valuation which was used.

However, I will say that if the Commission shall feel that any change in the situation occurring since it formulated the price or indeed that its own reappraisal of the value warrants a change in the effective price, I should want it to feel free to file, prior to the entry of the decree herein, supplemental findings which under the Supreme Court decisions I should feel constrained to accept and translate into the decree if found to be supported by material evidence in the record and consistent with legal standards. And if the Commission should want further time to formulate such a report, I will accede to any request it may make that the entry of the decree be deferred.

## The Boston Terminal Company.

This company owes its existence to a special Act of the Massachusetts legislature enacted in 1896. Acts 1896, c. 516.

The object of the Act was, as stated in its first Section: "to construct and maintain a union passenger station in the southerly part of the city of Boston, and to provide and operate adequate terminal facilities for the several railroad companies hereinafter authorized to hold the stock of said terminal company, and for the accommodation of the public in connection therewith."

Section 2 of the Act grants authority to five railroads by name to subscribe to the stock of the company which is fixed at $500,000, each being allowed to subscribe one-fifth thereof, or $100,000 in par value. The five railroads named are the Boston & Albany—now leased to the New York Central,—the Boston & Providence, the Old Colony, the New England, and the New York, New Haven & Hartford Railroad Company, "being lessee" of the Old Colony.

The third section provides for the government and direction of the affairs of the Terminal Company by five trustees, one to be appointed by each of said railroads.

Section 4 authorized the issue of bonds, in an amount to be approved by the Board of Railroad Commissioners of Massachusetts. The trustee under the mortgage was to be approved by the Board of Savings Banks Commissioners of Massachusetts.

By the terms of this section, the railroads were to be held liable "in such proportions as may be just and equitable, having regard to the use which they or their lessees may have respectively had of the mortgaged property" for any deficiency in the principal or interest on said bonds in the event of default and foreclosure. And the Supreme Judicial Court of Massachusetts was given jurisdiction in equity to enforce this provision and compel payment.

Under Section 6 of the Act the trustees were authorized to prepare plans for the construction of the station which were then to be submitted to the Mayor of Boston for his approval or disapproval in writing. The plans were then to be submitted to the Board of Railroad Commissioners for approval or change after hearing, after which the station was to be constructed by the terminal company. The Supreme Judicial Court of Massachusetts, or any justice thereof, was given jurisdiction in equity to enforce this section.

Under Section 8 of the Act, the terminal company was to make reasonable rules and regulations for the use of the terminal which were to be subject to approval and modification by the Board of Railroad Commissioners of the Commonwealth of Massachusetts upon application of "either of said companies or the mayor." The regulations were to be enforced by railroad police officers to be appointed upon application of the terminal company.

Section 9 of the Act provided as follows:

"All said railroad companies upon the completion of said station shall use the same, and the terminal facilities provided by said terminal company on the land hereinabove authorized to be taken, for all of their terminal passenger business in Boston, instead of the passenger terminals now used by them, and the supreme judicial court, or any justice thereof, shall have jurisdiction in equity to enforce this provision; but said terminal company may con-

tract with either of said railroad companies for the use of such separate and specified portion or portions of the terminal station hereinafter provided for, as may be reasonably necessary for their respective use."

Section 10 of the Act provided that "said railroad companies hereby required to use said union station shall pay to the terminal company for such use, in monthly payments, such amounts as may be necessary to pay the expenses of its corporate administration and of the maintenance and operation of said station, and of the facilities connected therewith and owned by said terminal company, including insurance and all repairs, all taxes and assessments which may be required to be paid by said terminal company, the interest upon its bonds or other obligations issued under the provisions of this act as the same shall become payable, and a dividend, not to exceed four per cent. per annum, upon its capital stock."

Each of the railroads was required to pay these charges "in the proportion in which it has the use" of the terminal, the proportion to be determined by the railroads if they could agree upon it, if not by the Board of Railroad Commissioners of Massachusetts. And the Supreme Judicial Court of Massachusetts, or any justice thereof, was given jurisdiction in equity to enforce the payments on that basis.

Section 10 also provided that the payments so required of the railroad companies shall be deemed a part of their "operating expenses."

Section 25 of the Act provides that "The terminal company shall pay a franchise tax to the Commonwealth upon the true market value of its capital stock, without any deduction whatever, but its real estate required by this act to be used by said railroad companies shall be assessed to and the taxes thereon shall be paid by said railroad companies, and in the assessment of franchise taxes upon said railroad companies each of them shall be deemed to be the owner of said real estate in the proportion in which it then has the use thereof under this act."

The Commission's plan (Paragraph N(1) Fourth Supplemental Order) modifies the obligations imposed by the Terminal Company Act as follows: the charters and statutory obligations of the reorganized New Haven and of the Old Colony[7] are so amended or superseded:

(a) that the reorganized New Haven and the Old Colony are relieved of obligation to continue the use of Boston Terminal Company property or to make payments for such use if and when such use shall be discontinued,

(b) that their obligation, while using said property, to pay the interest or principal of the terminal company bonds (including any deficiency on foreclosure) not paid before October 30, 1939 (the date on which this court ordered (pg. 6169) the New Haven trustees to discontinue the payment of such Old Colony obligations to the terminal company)—(See Palmer v. Webster & Atlas Nat. Bank, 312 U.S. 156, 61 S.Ct. 542, 85 L.Ed. 642) is reduced (by a stated formula) from $187,684 annually to about $96,250.

(c) that the obligation to pay operating expenses shall be limited to the amount of such expenses after deducting all revenues from rentals and concessions.

The foregoing limitations, however, are qualified by provision that "if the number of passengers using the South Station of the Boston Terminal Company shall substantially increase in the future, this Commission will consider an application by any bondholders of the Terminal Company to make an equitable revision of the amount payable by the reorganized company."

At the outset, a point of construction arises. The Terminal bondholders, in an apparent but understandably human effort to make the plan look as arbitrary and unreasonable as possible in the hope that it will not be approved, assert that the effect of the plan is to leave them without option to repossess their property and exclude the New Haven and Old Colony. But this, I think, is not so. Agreeable to the power in the court, as recognized in Paragraph R of the plan, I construe the plan to recognize a right in the Terminal Company, such as the lessor of a lease rejected by trustees in bankruptcy would have, to make its own election as to whether it will repossess or will acquiesce in the continued

[7] The Commission's plan for the reorganization of the Boston & Providence contains similar provisions for the modification of Boston & Providence obligations to the Boston Terminal Company. The offer by the New Haven to acquire the Boston & Providence which is contained in the New Haven plan is conditioned upon the accomplishment of the modification of Boston & Providence obligations to the Terminal which are provided for in the plan for the Boston & Providence.

occupation of the using railroads under the terms proposed in the plan.

The Terminal Company, of course, as a "creditor" within the definition of Section 77, if it shall treat the plan as constituting a breach of the debtor's obligation and by virtue of that breach shall repossess the property, is assured of its claim in damages under the last paragraph of Section 77(b) (provided the breached obligation may be deemed to be an "executory contract" within the meaning of the Act). At first, I confess, I thought the plan contemplated that the Terminal Company even if it should accept the modified terms offered would have a claim in damages as well. But now that I am left to make an adjudication on the merits further study of the plan convinces me that its content is such that an acceptance of the modified terms will operate as a waiver of any claim in damages. In other words, the plan having terminated the debtor's obligation to use the property leaves it optional with the Terminal Company to repossess and claim in damages, or to accept the modified terms proposed in lieu of repossession and damages.

These constructions may be confirmed in the decree to be entered herein, and in formulating the decree attention should be given to the need of defining the time within which the option extended to the Terminal Company may be exercised.

With the problem thus clarified, I come to consider the main contentions of the Terminal Company interests.

■ The contention is earnestly pressed that there is an absence of federal power to disturb obligations created and imposed by the Special Act of the Massachusetts legislature in the furtherance of the public policy of the State.[8] But the federal power, both under the Bankruptcy clause of the Constitution and under the Interstate Commerce clause, Const. art. 1, § 8, cls. 3, 4, is paramount. To be sure, until the field is occupied by an exercise of the federal power the State power is un-

affected by the existence of non-exclusive federal power—potential but unexercised—under the Constitution. And so it is that no one questions that the Boston Terminal Act was legal when enacted and is still legal. And so 'in earlier days, in the absence of a national bankruptcy act, the effect of State insolvency acts was limited only by the territorial boundaries of the States. The field of railroad rate regulation also long was left to legislative action by the States. But these wide fields of State power have been circumscribed as the need arose for the exercise of broader federal powers theretofore dormant.

The contention is made that the Boston Terminal Act was an exercise of the police power of the State. But that Act has many features only two of which are involved here: (1) the obligation to pay Terminal bondholders and (2) the obligation to use the South Station. It is implicit in the Webster & Atlas decision, 312 U.S. 156, 61 S.Ct. 542, 547, 85 L.Ed. 642, that in creating the obligation to pay the Massachusetts legislature was not acting in an exercise of the police power. The court distinguished the obligation to pay bond interest from an obligation to comply with the "rules of law of the state of operation affecting the conduct of the business."

■ Perhaps somewhat closer is the question whether the legislature acted in the exercise of its police power when it imposed the *obligation to use* the South Station. But howsoever the Act may be labelled or classified, the very nature of the obligation brought it within the field of federal power. It seems to me indisputable that when the legislature required an interstate railroad system to use the South Station it entered the field of power falling within the Interstate Commerce Clause of the Constitution. And when it created an executory obligation to pay it entered the field of the Bankruptcy Clause. Both of these fields have since been largely occupied by federal legislation. To the extent that the State-imposed obligation now collides with the exercise of lawful authority under

---

[8] Although Terminal bondholders invoke the inviolability of State authority, and had some support for this position from the Commonwealth at the hearing, it will be observed that the Commonwealth when faced with the possibility that it may become a proprietor of passenger service on the Braintree segment desires assurance that in its proprietary capacity as successor to Old Colony it may enjoy the use of the South Station under the reduced terms provided by the plan for the Old Colony. And this right has been included in the option which has the sanction of the Commission. But the right, of course, will never come into existence if the Terminal Company shall elect to repossess.

such federal legislation, it must give way. Nothing in the conclusion, in my opinion, conflicts with the holdings of Atchison, T. & S. F. R. Co. v. Railroad Commission, 283 U.S. 380, 51 S.Ct. 553, 75 L.Ed. 1128. Cf. Murray v. Roberts, 2 Cir., 103 F.2d 889, or other cases upon which the Terminal Company interests rely. Indeed, I accept the analysis of the nature of the Terminal Company which was made by the Court of Appeals of the District of Columbia in New York, N. H. & H. R. Co. v. Interstate Commerce Commission, 60 App.D.C. 403, 55 F.2d 1028, 1033. The court there said of the Terminal Company:

"In other words, the terminal company was little more than a holding corporation for the various railway companies interested. The railway companies were designated in the charter as the stockholders of the terminal company. They were the terminal corporation to whom the State had granted the franchise. They assumed the obligation of constructing the terminal as well as its maintenance and operation. The terminal corporation as such, assumed no liability either in construction, maintenance, operation, or otherwise. Looking through the corporate shell of the terminal company, the real owners, the railway companies, can be seen. It is similar to a one-man corporation except that here there is not even the necessity for voting shares."

Plainly without warrant is the insistence that this court should delegate a decision of this controversy to the State Courts of Massachusetts under the doctrine of such cases as Commonwealth of Pennsylvania v. Williams, 294 U.S. 176, 55 S.Ct. 380, 79 L.Ed. 841, 96 A.L.R. 1166, Fenner v. Boykin, 271 U.S. 240, 46 S.Ct. 492, 70 L.Ed. 927, and City of Chicago v. Fieldcrest Dairies, 316 U.S. 168, 62 S.Ct. 986, 86 L.Ed. 1355. These were cases involving issues determinable under State law. Here, however, there is no issue as to what the State law is: the issue is whether the national policy as manifested in the Bankruptcy Act must be trimmed to avoid conflict with the effect of a State law. This is an issue for the exclusive jurisdiction of the bankruptcy tribunal which is "not at liberty to surrender its exclusive control over matters of administration, or to confide them to another tribunal." United States Fidelity & Guaranty Co. v. Bray, 225 U.S. 205, 218, 32 S.Ct. 620, 625, 56 L.Ed. 1055. The task of the Bankruptcy Court is not always pleasant, but it may not be shirked.

Passing from the broad question of federal power, Terminal Company interests challenge the existence of power under Section 77 for the Commission to propose and for the court to approve the arrangements contemplated by the plan.

This contention also I must overrule. For under Section 77, a plan may "include provisions modifying or altering the rights of creditors generally * * * either through the issuance of new securities * * * or otherwise." Subdivision b (1). And creditors are defined to include "all holders of claims of whatever character against the debtor or its property * * * including the holder of a claim under a contract executory in whole or in part." Subdivision b, second paragraph. Under this sweeping definition, surely the Terminal Company is a creditor under b (1).

A plan may also "provide for fixed charges (including fixed interest on funded debt * * *) in such an amount that, after due consideration of the probable prospective earnings of the property," etc. Subdivision b(4). Surely the obligation of Old Colony to pay Terminal bond interest constitutes a fixed charge, notwithstanding the statutory origin of the obligation.

Subdivision b(5) grants the power to reject "contracts of the debtor which are executory in whole or in part" through a plan which may also provide for "the amendment of the charter of the debtor." I agree with the Commission that the Boston Terminal Act was tantamount to an amendment of the debtors' charters. And under the classic doctrine of the Dartmouth College Case, 4 Wheat. 518, 4 L.Ed. 629, a charter, notwithstanding its legislative format, is essentially a contract.

In my opinion, the legality of the plan is sufficiently supported by the provisions of Subdivision b(5), authorizing the rejection of executory contracts and charter amendments. But even if the obligation here involved be viewed as one flowing neither from contract nor from charter, the treatment accorded to Terminal bondholders, I hold, is legally supported either by b (1) (for plainly Terminal bondholders are "creditors" under the statutory definition) or by b(4).

Subdivision f provides that upon confirmation the debtor "shall have full power and authority to, and shall put into effect and carry out the plan and the orders of the judge relative thereto, * * *, *the*

*laws of any State or the decision or order of any State authority to the contrary notwithstanding.*" I agree that these are not the words of a grant. But the provision is confirmatory of the grant of powers accomplished by the other passages quoted just above,—and confirmatory of a grant broad enough to override the State law.

Hence it is that in Palmer v. Massachusetts, cited above, the Supreme Court construed the Congressional reluctance to interfere with local law as so qualified as to except powers which are a "part of a complete plan of reorganization for an insolvent road" as proposed by the Interstate Commerce Commission.

If we may consider the relationships here involved as analogous for present purposes to those existing between the parties to an executory contract or a lease, as I think we may, the Milwaukee case with its rulings on the treatment afforded to the Terre Haute lease amply supports the legality of this plan. To be sure, the modified lease offered by the Milwaukee plan to Terre Haute bondholders ran for a definite term. Here, under terms offered to the Terminal Company the using railroads may discontinue their use at will. But this feature of the terms does not affect the legality of the plan. Here, as in the Milwaukee case, the plan leaves it optional with the creditor to repossess or to accept the modified terms. And the fact that here the new tenancy is at the will of the debtor, instead of for a specified term as in the Milwaukee case, merely furnishes the creditor with more incentive to repossess.

Terminal bondholders attack the legality of that provision of the plan which recognizes the right of the using debtors to absorb the rents and the income from concessions in the station property. The argument is made, if I understand counsel aright, that the Boston Terminal Act created a public trust and that the representatives of the debtors serving as trustees of the Terminal Company are trustees accountable to the bondholders for this income. It is apparently conceded that the using debtors might properly use this income for capital improvements, additions and betterments to the property, but the contention is made that the trustees are accountable to the bondholders for the excess, if any. The abrogation of this accountability is claimed to be unlawful.

But as to this, as was stated in argument by counsel for the Terminal Company,

"nothing was said in the Act as to revenues from rentals and concessions although it was known then and it is known now that such revenues, especially with a large building in which extensive provision is made for offices, were bound to accrue." And for 45 years the using debtors have received this income to their own use, unchallenged, and until involved in bankruptcy without question on their part met their obligation to run the property, to pay for its additions and betterments, and to meet its fixed charges. This feature of the plan serves only to confirm an arrangement of 45 years' standing. However, even if Terminal interests are right in their construction of the Act, the obligation to account for excess income, just as much as the obligation to pay bond interest, is subject to modification in a plan.

Particular objection is made to the plan in that it limits what the debtor shall pay for its use of the property during the period prior to the consummation of the plan—as well as for the ensuing future. It is contended that compensation for use during the reorganization period is an expense of administration which can be settled only by the court after hearing.

But here again the objectants overlook the option which the plan affords to the Terminal Company. To be sure, if it shall elect to stand upon a breach and to repossess, it will be entitled to look to the court for compensation for such use of its property as was made by the court's trustees. The modified terms of the plan are extended only in the form of an offer: if the offer shall not be accepted the Terminal Company may file an appropriate petition for the adjudication of this item also of its claim. Whether, on any such petition, the compensation shall be measured by the stipulations of the Boston Terminal Act, and how recovery may be enforced against the Old Colony estate in view of the existing situation, are questions not necessary now to determine. The important point for present purposes is merely this: that whatever the rights of the Terminal Company in this respect may be, the plan leaves them undisturbed.

Satisfied that all legal aspects of the features of the plan relating to the Terminal Company are within the scope of Section 77, I turn to consider whether the substance of the plan is warranted under the facts. For the dimensions of my responsibility for this phase of the task, I

look again to the Milwaukee case for guidance.

In the Milwaukee case, it was held that the Commission had authority in a plan "to condition acceptance of a lease on terms which are necessary or appropriate to keep the fixed charges within proper limits or to do equity between claims which arise under the lease and the other claims against the debtor." In this connection, the court emphasized the fact that "a disregard in that determination of the sacrifices which other creditors are making would be wholly incompatible with the standards which § 77 has prescribed for reorganization plans."

This doctrine I hold to be applicable here even though the fixed charge here under consideration happens not to flow from a lease. The rule announced, both in letter and spirit, extends to "fixed charges." And the Terminal obligation is as much a fixed charge as would be a lease of similar purport.

In the Milwaukee case, the court went on to explain why it was that "the question whether a lease should be rejected and if not on what terms it should be assumed is one of business judgment." And it held that an exercise of such judgment by the Commission would be upset by the court on review only "on a clear showing that the limits of discretion have been exceeded." This doctrine also is applicable here, and I come to examine the determination of the Commission against that background.

The Commission noted that although the debtors' obligation is indeed "fixed", the passenger use of the South Station has shrunken from 24,700,000 in 1901, the first full year of operation, and from 45,000,000 in 1920 to 17,700,000 in 1941. It also noted evidence tending to show that cost per passenger is out of line with the revenue per passenger. It considered evidence tending to show that the value of the South Station and adjacent property had decreased greatly in value, and that whereas the assessed valuation of properties in the vicinity had declined 45% in the last twenty years the assessed valuation of the South Station in the same period had declined only 6⅓ per cent.

The Commission concluded that in its opinion "the bond interest is excessive as related to the present and prospective use to be made of the South Station" and that reduced payments which it recommended as an alternative to an unconditional rejection of the obligation "represent a fair measure of the value of the present and prospective use of the terminal company property by the debtors herein."

In the light of the applicable law referred to above, this conclusion must be taken as an exercise of the business judgment of the Commission. Considering the conclusion against all the evidence in the record, I cannot say that even the eloquent argument of counsel made at the hearing in court constitutes "a clear showing that the limits of discretion have been exceeded."

The problem presented to the Commission was a difficult one. To be sure, net cost to the debtors of the Terminal Company obligation was a matter readily ascertainable from their payments in past years. But not so as to the value of the correlative privilege of using the station property. What was it worth to Old Colony to be able to discharge its passengers at the South Station? The answer would depend in part, I suppose, upon the effect on Old Colony income of some substituted terminal. (It may be observed that for the Boston & Providence the existence of its Back Bay Station would furnish the answer to the question just posed.)

The problem presented required a broad estimate of the situation not only under existing conditions but also in the future. Will the termination of restrictions on gasoline and rubber cause future shrinkage in the passenger use? And how as to future costs? The real estate taxes in 1942 amounted to $656,000, of which about $229,600 was assessed against Old Colony (and an equal amount against Boston & Providence). Especially in view of past operating deficits this is a fixed charge of large dimensions to assume in perpetuity. And the evidence noted above suggests that the reorganized company if left subject to the full rigor of the Terminal obligations would assume the hazard either of increased taxes or of bearing more than its fair share of the community tax burden.

These and many other factors also required interpretation in the light of the established fact that in normal times Old Colony passenger service has resulted in operating deficits and in the light of those provisions of the plan under which the reorganized New Haven will be obligated to maintain such service as long as the resulting deficit shall not exceed $500,000 biennially. What is it worth to be privileged to use an expensive terminal for the service of a losing business?

All these were questions calling for an expert and informed business judgment,— a judgment also qualified to appraise the impact upon the public interest of fixed charges fastened upon the agencies of public transportation. The conclusion of the Commission that the obligation was too burdensome to justify its assumption was in the exercise of such a judgment and I hold it to be well within the limits of discretion.

But the sacrifices which the plan necessarily asks of other creditors are enough in my opinion to justify the proposals made. In my discussion of the Old Colony features of the plan, I showed how the requirement of continued passenger service on Old Colony lines as long as the deficits should not exceed $500,000 biennially in effect squeezed something like $6,000,000 out of Old Colony capital. For a claim of $22,-597,158 (principal $16,448,000 plus $6,149,-158 in defaulted interest) Old Colony bondholders under the plan will receive at most only $8,611,622 in new securities of which $3,690,695 will be in contingent interest bonds. With Old Colony bondholders called upon to absorb all this loss it is utterly unfair to call upon them to absorb the further loss which will result if the Terminal obligation be not modified, to the end that Terminal bondholders may escape unscathed. It is even implicit in the plan that the demands of the Massachusetts public authorities for deficit-producing passenger service for the benefit of the local public shall be substantially limited.

Thus here, even more abundantly than in the Milwaukee case, "there was ample evidence warranting the conclusion of the Commission" that the assumption of the old obligation in all its rigor "would be unjust from the viewpoint of other creditors." And I am satisfied that on that ground alone the Commission's conclusion does not exceed the limits of discretion.

Having thus approved the conclusion that the Terminal obligations ought not to be fully assumed in perpetuity, I come to the discharge of my allotted task in respect to the modified terms which the Commission has proposed as an alternative to unconditional rejection and repossession by the Terminal Company of its property.

The terms upon which the obligation may be assumed is also "one of business judgment." Milwaukee case, 318 U.S. 550, 63 S.Ct. 743. Whether the terms shall be accepted is for the Terminal Company to decide, as I have already pointed out so often. As I see it, the problem for the Commission in formulating an offer of modified terms was to appraise the net desirability (both from the public and private viewpoint) of providing for the continued availability of the South Station facilities to the using debtors. If the Commission had found such availability highly desirable, it would doubtless have devised terms sufficiently attractive to the Terminal Company reasonably to assure the acceptance of the terms. And if the Commission had found such availability of slight importance, it might properly have adapted its proposed terms not so much to the need for Terminal acceptance as to the public need for transportation free from excessive fixed charges. Plainly the task was one of great delicacy. The balance struck in the conclusion reached I hold to be within the bounds of discretion.

■ One other objection remains for consideration. The Terminal interests contend that they were without notice of the proceedings before the Commission and that therefore they were deprived of all opportunity to present evidence to the Commission and to be heard by it. But this objection was pressed before the Commission upon motions to reopen. These motions were wholly denied by the Commission upon grounds which were outlined (with considerable restraint, I think) in the Fourth Supplemental Report (pg. 10159).

When the plan came on again for hearing before the court, again Terminal Company interests made a belated effort to reopen the record of fact and an elaborate offer of proof was presented in their behalf. This I wholly denied. The great bulk of the evidence thus offered was evidence which if seasonably prepared might have been presented to the Commission in orderly course before its record had been closed. If this had been done, an offer of supplementary evidence to bring down to date data already before the Commission would have been more hospitably entertained.

I felt, however, that impelling considerations of orderly procedure—indeed, of the basic procedure contemplated by Section 77 —required me to resist this effort to produce the case in chief first before the court. The Act, of course, contemplates that such material shall first be submitted to the Commission as the primary fact-finding authority in the field of railroad reorganization. The Commission has reported to the court in this very connection that

although "we would have welcomed the seasonable introduction of evidence by the terminal interests, we are unable to agree with the contention that the record on which we acted was inadequate." Bearing in mind that the court is "brigaded" with the Commission in the administration of the Act, I felt that I should not allow these parties to use the court, as it were, as a back door to the Commission—especially when satisfied that they had had abundant opportunity to approach the Commission through its front door in company with all the other parties in the case.

But even more compelling was another consideration. This plan, it will be remembered, contemplates the New Haven acquisition of the Old Colony and Boston & Providence properties upon terms conditioned upon the approval of the Terminal Company features of the plan. If on motion of Committees representing a portion of the Terminal bondholders I should reopen and as a result of evidence thus received return the plan to the Commission for further proceedings, this complicated but carefully conceived plan will become unsettled and the result will necessarily be one of great delay, labor and expense to the huge mass of creditors who already have waited over eight years for the settlement of their claims. And thereafter when a plan should again come forward from the Commission, other Terminal bondholders not represented by the numerous existing committees will have as much right as the existing committees have now to demand a belated reopening in order that they too may be heard.

In the light of such considerations, it will be seen that the allowance of a reopening under such circumstances will frustrate a cardinal legislative objective—expeditious reorganization. If such practice shall have sanction, parties may safely stand outside the proceedings—just as was done by the Terminal interests in these proceedings— free to accept the product of the Commission's labor if they like it, otherwise to insist that the Commission (and all the other parties) shall begin their laborious task anew.

I conclude therefore that all the features of the plan relating to the Boston Terminal Company should now be approved.

### Effective Date.

The plan in Paragraph A provides simply: "The effective date of the re-organization as of which the claims of creditors shall be capitalized shall be July 1, 1943."

Counsel for the trustees feel that confusion will be averted if this provision be now clarified. I agree.

The Commission fixes July 1, 1943 as the "effective date of the reorganization as of which claims of creditors shall be capitalized". As this date is substantially before the plan can be consummated and as the books of account, reports to the Commission and State authorities, and federal and state tax returns are prepared during the proceedings on the basis of interest accruing on obligations now outstanding, which obligations continue in their present form until consummation of the plan (Section 77, subsection f), I construe the plan as follows:

The "effective date" is merely a computation date to determine the extent to which the claims of present creditors shall be capitalized in new securities, but not to affect any of the creditors' claims pending the actual issue of such new securities. The carrying out of the plan is not intended to require any retroactive change in the operations of the bankruptcy trustees or in their accounts, or in the reports made to the Commission, or in any other reports or returns made to any State or federal authority for the period prior to the date when such new securities are issued. Subject to the approval of the court, the reorganization managers may cause any issue of new securities to be dated as of or near the date of consummation, with appropriate adjustments for interest accruals and payments to said date.

This construction is patterned largely on the analogous provisions in the Rock Island plan, 247 I.C.C. 533, 572. I believe it gives full effect to every objective which the Commission had in mind for these proceedings and at the same time provides a desirable measure of flexibility which will facilitate consummation.

Consistently with the foregoing the decree may provide that if any future payment of defaulted interest shall reduce the claim of a secured creditor who under Appendix X would receive new fixed interest or new contingent interest bonds in total or partial satisfaction of his claim, the excess of new bonds thus becoming available shall be redistributed under the method used in the formulation of Appendix X.

# APPENDIX X.

| | Estimated Amounts as of June 30, 1943 | FIXED INTEREST BONDS Original Allocation (B) | Distribution of Excess | Total | INCOME BONDS Original Allocation (B) | Distribution of Excess | Adjustment of Excess (B) | Total | BALANCE IN PREFERRED STOCK | PERCENTAGES Fixed | Income | Preferred |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Danbury & Norwalk 1st & Refunding | 351,167 | 70,283 | 35,094 | 105,327 | 140,467 | 13,875 | + 108 | 154,450 | 91,390 | 29.99 | 43.98 | 26.03 |
| 1st & Refunding | 154,695,443 | 30,939,089 | 15,459,573 | 46,398,662 | 61,878,177 | 6,112,379 | + 47,688 | 68,038,144 | 40,238,637 | 29.99 | 43.98 | 26.03 |
| Sixes of 1940 (OC) | 3,979,200 | 735,840 | 397,664 | 1,193,504 | 1,591,680 | 157,225 | + 1,227 | 1,750,132 | 1,035,564 | 29.99 | 43.98 | 26.03 |
| | 26,105,000 (A) | 5,221,000 | 2,608,817 | 7,829,817 | 10,442,000 | 1,031,433 | + 8,048 | 11,481,501 | 6,793,682 | 29.99 | 43.98 | 26.03 |
| New Haven & Northampton | 2,408,000 | 1,204,000 | 601,612 | 1,805,612 | 602,000 | 59,465 | −59,077 | 602,388 | — | 74.98 | 25.02 | — |
| Boston & New York Airline | 4,970,417 | 00 | 00 | 00 | 2,485,209 | 245,487 | + 1,915 | 2,732,611 | 2,217,806 | — | 54.98 | 45.02 |
| National Rockland | 108,550 (A) {C.N.E. 43,000 (C)} | 13,110 | 6,551 | 62,661 | 26,220 | 2,590 | + .20 | 28,830 | 17,059 | 57.73 | 26.56 | 15.71 |
| Rhode Island Hospital | 230,000 (A) | 46,000 | 22,985 | 68,985 | 92,000 | 9,088 | + 71 | 101,159 | 59,856 | 29.99 | 43.98 | 26.03 |
| | 192,847,777 | 38,332,272 | 19,132,296 | 57,464,568 | 77,257,753 | 7,631,462 | 00 | 84,889,215 | 50,493,994 | | | |
| Housatonic | 2,842,492 | — | — | 2,842,492 | | | | | | | | |
| New England | 17,500,000 | — | — | 17,500,000 | | | | | | | | |
| C.N.E. | 12,054,000 | — | — | 12,054,000 | | | | | | | | |
| | 225,244,269 | | | 89,861,060 | | | | | | | | |
| Old Colony Acquisition | | 3,289,600 (G) | 1,631,327 (H) | 4,920,927 | 2,467,200 (G) | 1,223,495 (II) | | 3,690,695 | 3,690,695 | | | |
| | | 41,621,872 | 20,763,623 | 94,781,987 (D)(I) | 79,724,953 | 8,854,957 | | 88,579,910 (F)(I) | 50,493,994 (I) | | | |

(A) Amount of Collateral held with interest.
(B) Original Allocations 20-40-40, except New Haven-Northampton 50-25-25
 Boston-N. Y. Airline 50-50
 National Rockland (100 on C.N.E. Bonds)

(C) $43,000, of National Rockland collateral is in C.N.E. bonds, $65,550, in First & Refundings.
(D) Total Column 3, Appendix A shown at P. R. p. 10174—$1,452,387 plus 3,280,600 to O. C. shown at Note 24, P. R. p. 10175.
(E) New Haven-Northampton requires $602,388, in Income Bonds to equal, with Fixed Interest Bonds of $1,805,612, its amount of $2,408,000.
 Under the computation it would receive $661,465, in Income Bonds. The excess of $59,077 has been spread among the remainder.
(F) Total Column 4, Appendix A shown at P. R. p. 10174—86,112,710 plus 2,467,200 to O. C. shown at Note 24, P. R. p. 10175.
(G) Note 24, p. 10175—2nd item
(H) Tentative amount of additional securities to O. C. for 1942-1943 earnings in excess of estimates, $2,854,822 of which 57.14% + fixed and 42.86%—Income.
(I) Includes new securities for the acquisition of the Old Colony, as follows:

| | Fixed Int. Bonds | Income Bonds | Preferred Stock |
|---|---|---|---|
| Add, in acquisition of Old Col. properties | 4,920,927 | 3,690,695 | |
| Deduct—Account of $3,600,000 of bonds owned by O. C. (See Note 1, P. R. p. 10175) | 1,193,504 | 1,750,132 | 1,035,564 (a) |
| Net addition | 3,727,423 | 1,940,563 | |

Does not include the new securities to be issued in the event that the properties of the Boston and Providence are acquired as contemplated by the plan. If those properties are so acquired the grand total figures will be changed as follows:

| | Fixed Interest bonds | Income bonds | Preferred stock | Fixed Interest | Contingent Interest |
|---|---|---|---|---|---|
| Add: | $9,039,213 | $1,467,520 | $1,467,520 | $121,509 | $66,038 |

Total capitalization will be changed from $370,756,800 to $376,731,053 (Cf. Note 24, P. R. p. 10175); total fixed interest from $5,325,080 to $5,446,649; total contingent interest from $3,907,338 to $3,973,376.
Fixed interest bonds total $1,588,483 (94,781,987—1,193,304)
Income bonds total $6,829,778 (88,579,910—1,750,132)

(a) This amount of preferred stock would be cancelled, leaving a total, of 49,458,430 (50,493,994—1,035,564)

### General Observations and Conclusion.

This opinion necessarily has been chiefly devoted to the salient points of controversy raised by objections filed to the plan certified by the Commission to the court. My rulings on these issues have now all been recorded and discussed. I will now add that my attention has not been focused on the points of controversy to the exclusion of the many other important features of the plan which happily have evoked no opposition at this stage. After studious review of the entire subject matter, I can at least say that I am satisfied that the plan in its entirety—with the corrections which are indicated in this opinion,—should be approved.

The corrections, which I have indicated to eliminate what I conceived to be the unobserved impact of illegal standards and to reflect material changes occurring since the plan came forward, since all based upon findings of the Commission and consistent with its limitations, are all, I believe, within the power of the judge to make. Likewise, as to the constructions which I have put upon the plan.

But having in mind the thought that the task of the court is brigaded with that of the Commission, let me express the hope that our combined efforts may not suffer from the lack of suitable liaison at this critical stage in the proceedings. And to provide appropriate opportunity for such liaison I will say that if the Commission after reading my opinion shall wish, of its own motion, to file any supplemental report or order, whether adapted to confirm my proposed action or to require action in another direction, I shall be glad to shape my decree accordingly. The procedure which I have suggested looking toward a possible disposition of the Bank claims I view as well adapted to facilitate and expedite the reorganization. But if the Commission shall have contrary views, I should welcome their counsel at the hearing which I expect will be held to consider any application by the trustees for authority to pay these claims in cash.

In view of the existing situation I think it desirable that counsel if they wish shall have an opportunity to be heard on the form of the decree. I will ask counsel for the trustees, in consultation with myself, to prepare an appropriate draft and circulate it amongst the parties as soon as may be.

And this draft decree (in the absence of any request for continuance by the Commission) may be brought on for settlement at New Haven on January 18th, 1944, at 11 A. M. And any petition by the trustees for authority to pay the Bank claims in cash will be assigned for hearing at the same time.

NOTE.—No decree was entered upon this opinion. On January 18, 1944, by order of court the trustees of the Debtor's estate wholly discharged in cash, on stated terms, the claims of the Bank Group, the objections of which to the treatment proposed are discussed and sustained in the foregoing opinion. And on February 8, 1944, the Interstate Commerce Commission certified to the court an amended Plan as contained in its Fifth Supplemental Order in these proceedings which was the subject matter of an opinion of the court entered on March 6, 1944. A decree on this latter opinion was entered on March 6, 1944. See 54 F. Supp. 631.